Karen **CRUZ**, Plaintiff,

v.

The **IMMIGRATION AND NATURALIZATION SERVICE, and A.D. Moyer, as District Director of the Chicago District of the Immigration and Naturalization Service**, Defendants.

No. 94 C 5025.

United States District Court,
N.D. Illinois,
Eastern Division.

Jan. 5, 1995.

James Hallagan of Minsky McCormick and Hallagan, P.C., Chicago, IL, for plaintiff.

James G. Hoofnagle, Jr., Sp. Asst. U.S. Atty., Chicago, IL, for defendants.

1. This opinion will cite provisions of the Act as "Section—," using the numbering in Title 8 rather than the Act's internal numbering. Relevant provisions of the Code of Federal Regulations, which are found in 22 C.F.R., will be cited "Reg. § —."

2. Although neither side raised the issue, it is a court's duty to address its subject matter jurisdiction sua sponte. Thus the provision of Rule 12(h)(3) to that effect finds its echo in *Wisconsin*

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Karen Cruz ("Karen") brings this action against the Immigration and Naturalization Service ("INS") and its Chicago District Director A.D. Moyer ("Moyer"), contending that their denial of her application for an adjustment of status under Section 245 of the Immigration and Naturalization Act (the "Act"), 8 U.S.C. § 1255(a),[1] constituted an abuse of discretion and a violation of her rights under the Due Process and Equal Protection Clauses. Here is Section 1255(a) in its entirety:

> The status of an alien who was inspected and admitted or paroled into the United States may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.

■ Karen seeks both a declaratory judgment and an injunction prohibiting defendants from initiating deportation proceedings against her. Defendants have moved alternatively (1) under Fed.R.Civ.P. ("Rule") 12(b)(6) to dismiss the Complaint for failure to state a claim or (2) under Rule 56 for summary judgment, while Karen has filed a cross-motion for summary judgment. For the reasons stated in this memorandum opinion and order, this Court sua sponte dismisses this action under Rule 12(h)(3) for lack of subject matter jurisdiction, thus rendering both of defendants' motions and Karen's cross-motion moot.[2]

*Knife Works v. National Metal Crafters,* 781 F.2d 1280, 1282 (7th Cir.1986):

> The first thing a federal judge should do when a complaint is filed is to check to see that federal jurisdiction is properly alleged.

That of course is a continuing duty. And the lack of prior notice to the parties should cause no problem, for this sua sponte dismissal still gives any party that believes an error has been committed the opportunity to address the matter by a timely Rule 59(e) motion.

## Facts[3]

On April 1, 1965 Karen was born to Sonia ("Sonia") and David ("David") Cruz (collectively the "Cruzes") in Manila, Philippines (A.R. 3). Sonia and David emigrated to the United States during the late 1960's (A.R. 18, 40), leaving their daughter Karen and a son Lawrence behind in the Philippines (A.R. 19). On June 8, 1972 the Cruzes divorced (A.R. 1), and Sonia later changed her last name to Yballe (A.R. 23). On November 14, 1973 Sonia received her certificate of naturalization from the District Court in St. Paul, Minnesota (A.R. 22). Sonia currently resides and practices medicine in Chicago (A.R. 18–19), while David lives somewhere in Minnesota (A.R. 5).

On November 21, 1990 Sonia filed on Karen's behalf a Form I–130 visa petition with the American Consul in Manila (A.R. 1–2). That petition placed Karen in one of the several categories of immigrant applicants accorded preferential treatment under the Act: in this instance the unmarried adult sons or daughters of United States citizens (Act § 1153(a)(1)). Each year up to 23,400 applicants in that category (plus the number of any unused visas under Act § 1153(a)(4)) are awarded immigrant visas (Act § 1153(a)(1)). Such a visa entitles the holder to lawful permanent residency (Act § 1101(20)), and with five years' good behavior he or she can usually expect to become a United States citizen (Act § 1427(a)).

Karen's problems stem from the fact that she is of Filipino origin, as a result of which she bumps up against an annual per-country limitation of approximately 25,620 for family-sponsored and employment-based immigrants (Act § 1152(a)(2); 2 Charles Gordon & Stanley Mailman, *Immigration Law & Procedure* ("Gordon & Mailman") § 31.02[3][a], at 31–11 & n. 36 (1993)). Without question the Philippines is the least desirable country of origin from an applicant's point of view, as its wait lists are long even for persons who like Karen are afforded preferential status. As of December 1993 United States citizens' unmarried adult sons and daughters hailing from the Philippines needed a priority date of August 14, 1985 or earlier to receive an immigrant visa (1 Gordon & Mailman § 1.03[2][e], at 1–27). With limited exceptions an applicant's priority date is the day upon which his or her Form I–130 was filed (Reg. § 42.53), and in Karen's case that was November 21, 1990 (A.R. 4). By contrast, sons and daughters from Mexico (the second-worst country of origin) faced a November 1, 1992 cut-off, while visas for sons and daughters from all other countries were immediately available without regard to date of filing (1 Gordon & Mailman § 1.03[2][e], at 1–27).

On October 27, 1992 Karen came to Chicago under a B–1 (temporary visitor for business) or B–2 (temporary visitor for pleasure) nonimmigrant visa, authorizing her to remain in the country through April 27, 1993 (A.R. 9, 13; Act § 1101(a)(15)(B); Reg. § 41.12). On March 9, 1993 Karen filed an I–485 application for an adjustment of status under Act § 1255(a) (A.R. 9–19). Karen's application was originally premised on the belief that as Sonia's child she would receive a derivative priority date of November 14, 1973, the day that her mother was naturalized (A.R. 32; Reg. § 42.53(c)). That date would have put her comfortably within the July 17, 1985 cutoff date then in effect (A.R. 34).

But INS refused to recognize such derivative priority through Sonia, on the ground that at the time that Karen's I–130 visa petition had been filed she was over 21 years of age and was therefore not a "child" for immigration purposes (A.R. 34, 48–49). INS considered itself bound by the general rule of Reg. § 42.53(a), rather than by the exception for spouses and "children" provided for in Reg. § 42.52(c). Accordingly it assigned Karen a priority date of November 21, 1990, the day that Sonia had filed Karen's I–130 (A.R. 34, 48–49). Because that date was years after the July 1985 cutoff, Karen's

---

**3.** What follows is not a full set of the relevant facts within the meaning of Rule 12(b)(6) (*Bowman v. City of Franklin,* 980 F.2d 1104, 1107 (7th Cir.1992)) or Rule 56 (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1980)). Instead it sets out a partial exposition of the certified administrative record ("A.R.") that has been furnished by defendants—enough to allow disposition of the jurisdictional question.

application for an adjustment of status was denied (*id.*).

Karen (or perhaps more appropriately, Karen's lawyers) then unearthed a 1966 edition of the Code of Federal Regulations and, attaching several pages as an exhibit, argued by letter that under the regulations then in effect Karen was entitled to derivative priority through her father David and should be assigned an even earlier December 20, 1966 priority date (A.R. 35–47). That prompted Moyer to do some digging of his own, as a result of which he received from the Office of Legislation, Regulations & Advisory Assistance of the Visa Office of the Department of State three pages from the June 1, 1966 Federal Register from which he concluded that the proffered regulations had been rescinded as of that date and were therefore not in effect when David filed his visa petition in December 1966 (A.R. 63–67). Karen's application was denied a second time.

*Ripeness or Exhaustion of Administrative Remedies*

Is defendants' denial of Karen's application for an adjustment of status reviewable by this Court? If that question were to be approached afresh the answer would almost certainly be a close call, involving often-elusive concepts (or as *Abbs v. Sullivan,* 963 F.2d 918, 925 (7th Cir.1992) put it, "murky rubrics") of ripeness, exhaustion and perhaps the futility-plus-hardship doctrine (see, e.g., *Health Equity Resources, Urbana, Inc. v. Sullivan,* 927 F.2d 963, 965–67 (7th Cir. 1991)). In light of the closeness and complexity of the issue, it is scarcely surprising that disparate answers have been given by district courts (contrast *Augoustinakis v. INS,* 693 F.Supp. 1554, 1554–56 (S.D.N.Y. 1988) (no) with *Toral Galvez v. Howerton,*

503 F.Supp. 35, 38 (C.D.Cal.1980) and *Stokes v. INS,* 393 F.Supp. 24, 27–28 (S.D.N.Y.1975) (yes)), and that Courts of Appeals are split as well (contrast *Massignani v. INS,* 438 F.2d 1276 (7th Cir.1971) (per curiam) (no) with *Jaa v. INS,* 779 F.2d 569, 571 (9th Cir.1986) (yes)).[4] See the discussion in 3 Gordon & Mailman § 81.02[2], at 81–29 to 81–30.

■ For this Court the task is much simplified: It is of course bound to follow and apply the decision of our own Court of Appeals in *Massignani* that the District Director's administrative action is *not* ripe for judicial review. Because this Court therefore lacks subject matter jurisdiction, this action must be dismissed.[5]

It should be emphasized that this result does not entirely foreclose ultimate judicial review, but simply defers it for potential presentation at a later date before a different court. There is no question that Karen can assert her claims before an Immigration Judge ("IJ") in a deportation proceeding, followed by an appeal to the Board of Immigration Appeals ("BIA") and by review by the Court of Appeals pursuant to Act § 1105a (see, e.g., *Patel v. INS,* 738 F.2d 239 (7th Cir.1984)). By invoking the exhaustion doctrine to deny any level of review by the District Court via Section 1329, our Court of Appeals has exercised a judgment not to afford an applicant judicial review twice— once by resort to the District Court from the District Director's discretionary denial of an adjustment status, and then again by resort to the Court of Appeals following a de novo presentation to an IJ and an appeal to the BIA. To the identical effect, *Kashani v. Nelson,* 793 F.2d 818, 823–27 (7th Cir.1986) has held in a closely related context that an alien seeking asylum may not obtain district

---

4. *Che–Li Shen v. INS,* 749 F.2d 1469, 1472 (10th Cir.1984) appears to subscribe to the *Massignani* position by stating that denials of applications for adjustment of status are judicially reviewable *only* as part of deportation proceedings. And *Jain v. INS,* 612 F.2d 683, 689–90 (2d Cir.1979) seems to tilt in the same direction.

5. It is not easy to explain the contrary ruling in *Nasan v. INS,* 449 F.Supp. 244, 245–47 (N.D.Ill. 1978). In the late 1970's—the days of the comparative infancy of LEXIS, when it was less accessible to litigants and was unavailable to

judicial staffs, and when to this Court's recollection Westlaw may not yet have entered the market—such a failure to locate direct Seventh Circuit precedent might have been more understandable than a similar failure today. But in any event, *Nasan*'s conclusion that the District Court had jurisdiction to review a discretionary denial of an adjustment of status failed to cite *Massignani,* or even to consider on its own the ripeness/exhaustion issue that *Massignani* had deemed persuasive.

court review of the District Director's denial of an asylum petition, nor may the alien enjoin deportation proceedings—instead he or she must exhaust administrative remedies by renewing the asylum petition in the ensuing deportation proceeding (accord, *Yim Tong Chung v. Smith*, 640 F.Supp. 1065, 1068–69 (S.D.N.Y.1986)).

Although voiced in a very different context, *In re Establishment Inspection of Kohler Co.*, 935 F.2d 810, 812 (7th Cir.1991) identifies the several familiar interests embodied in the exhaustion doctrine and brought to bear in both *Massignani* and *Kashani*:

> The exhaustion doctrine protects the autonomy of administrative agencies, respects administrative expertise, facilitates judicial review by ensuring a well-developed factual record, and promotes judicial economy by avoiding piece-meal review of cases and by giving the agency the opportunity to resolve the case to the parties' mutual satisfaction without judicial interference.

Those jurisprudential concerns bulk large in immigration law, whose mazelike complexity has been both (1) compared to King Minos' labyrinth and (2) cited as a prime example of "Congress's ingenuity in passing statutes certain to accelerate the aging process of judges" (*Tim Lok v. INS*, 548 F.2d 37, 38 (2d Cir.1977)).

*Conclusion*

Because Karen has failed to exhaust her administrative remedies, this action is not ripe for judicial review, and so it must be and is dismissed for lack of subject matter jurisdiction.[6] That renders both of defendants' alternative motions and Karen's cross-motion moot. As n. 2 reflects, if either side disagrees with this sua sponte dismissal of the

action, Rule 59(e) prescribes the method and the timing for seeking reconsideration.

---

**6.** This Court is of course sensitive to the problem that is faced by anyone who wishes to start the five-year time clock that leads to United States citizenship, with all of the benefits that such status confers, but who is forced to await deportation proceedings that may never be instituted if the INS does not choose to launch them. But *Massignani*, 438 F.2d at 1277–78 expressly considered and rejected that consideration as a basis for current entertainment of an action at the District Court level, while at the same time hold-

ing out the possibility for bringing such an action later if "deportation proceedings are not timely convened and the failure to do so impairs any rights or in any way results in injury to plaintiff" (*id.* at 1278).