Teodor G. **PAUNESCU** and Lelia A. **Paunescu**, Plaintiffs,

v.

**IMMIGRATION & NATURALIZATION SERVICE, Brian Perryman, District Director, Chicago, Ins, and United States of America, Defendants.**

No. 98 C 5971.

United States District Court, N.D. Illinois, Eastern Division.

Dec. 2, 1999.

---

James V. Noonan, James V. Noonan & Associates, Chicago, IL, Jeffrey Grant Brown, Chicago, IL, for Plaintiffs.

James G. Hoofnagle, United States Attorney's Office, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

GETTLEMAN, District Judge.

On September 23, 1998, plaintiffs Teodor and Lelia Paunescu filed a complaint for mandamus and declaratory judgment against the Immigration & Naturalization Service, District Director Brian Perryman and the United States of America seeking to compel defendants to immediately issue all appropriate documents and take all appropriate action to execute and process plaintiffs' applications under the 1998 Diversity Immigrant Visa Program, and to grant plaintiffs legal permanent residence through an adjustment of status. The parties have filed cross-motions for summary judgment.

### BACKGROUND

Teodor entered the United States in August 1995 on an F–1 Student Visa as a student at the University of Illinois. On August 19, 1997, he was appointed to the position of Graduate Teaching Assistant for the 1997–98 term. Lelia entered the United States on July 10, 1997, as a derivative spouse of Teodor. On July 29, 1997, Teodor was selected as a winner under the Fiscal Year 1998 Diversity Visa Lottery Program. Pursuant to instructions with the notification, plaintiffs applied for visas. Enclosed with those applications were the required fingerprint cards. The Department of Justice received plaintiffs' applications on November 5, 1997. The INS then scheduled plaintiffs' visa interviews on February 23, 1998. At that interview Teodor was told that his fingerprint card had been rejected by the FBI and that he was to go to an INS application support center to resubmit his fingerprints. He alleges that he was also told that absent the fingerprint problem his application would have been approved. That very same day Teodor delivered a new set of fingerprints via express mail to the interviewing officer. Five months later, on July 24, 1998, Teodor received a form letter informing him that his fingerprints had not yet cleared, without specifying any reason. The form letter contained the box to check if new fingerprints were required to be submitted. That box was not checked.

On September 18, 1998, just twelve days before the fiscal year ended, the INS directed plaintiffs to go to its office in Chicago. Teodor did so on September 21, 1998, and was informed that he had to submit a third set of prints. He immediately traveled to the INS support site in Hammond, Indiana and submitted his third set of fingerprints.

By September 23, 1998, plaintiffs, still without visa numbers, filed the instant action and moved for preliminary injunctive relief. On September 25, 1998, after a hearing, the court ordered defendants to "immediately complete adjudication of the applications for adjustment status" for both plaintiffs, without delay and by no later than September 30, 1998. The court order acknowledged, however, that the INS's ability to comply was contingent upon a favorable return of Teodor's fingerprints from the FBI and the final processing and issuance of visa numbers to plaintiffs by the Department of State on or before September 30, 1998.

The FBI failed to return Teodor's prints by the end of fiscal year September 30, 1998, leaving plaintiffs without visa numbers despite having fully complied with all requirements. In November 1998, plaintiffs moved for a rule to show cause, seeking to compel defendants to demonstrate

why they failed to execute and process plaintiffs' adjustment of status. Defendants moved to vacate the court's September 25, 1998 order, contending that the court did not have jurisdiction to consider plaintiffs' request. The court concluded that it had jurisdiction and denied defendants' motion to vacate. The court also denied plaintiffs' petition for a rule to show cause, stating that the relief plaintiff requested could not be granted on the limited record before the court.

The parties subsequently filed cross-motions for summary judgment. Plaintiffs once again ask the court to order defendants to complete the processing of plaintiffs' adjustment of status. Plaintiffs also argue in their motion that the court has the authority to direct defendants to adjust their status and issue them visas. Defendants renew their argument that the court does not have jurisdiction over the instant matter, and also contend that plaintiffs have not sustained their burden to invoke mandamus jurisdiction.

## DISCUSSION

■ Plaintiffs assert in their complaint that this action arises under 8 U.S.C. § 1329, 28 U.S.C. § 1331, and 28 U.S.C. § 1361.[1] In their cross-motion for summary judgment, defendants argue that the court does not have jurisdiction over the instant case. Defendants reiterate the argument they made in their motion to vacate that various sections of the INA, specifically 8 U.S.C. § 1252(g) and § 1252(a)(2)(B), deprive the court of jurisdiction. Defendants also argue that plaintiffs have not made a showing sufficient to allow the court to assume jurisdiction under the mandamus statute, 28 U.S.C. § 1361.

### A. Section 1252(g)

■ The court once again rejects defendants' argument that § 1252(g) applies in the instant case. As the court explained in

its order denying defendants' motion to vacate, the Supreme Court in *Reno v. American–Arab Anti–Discrimination Committee*, 525 U.S. 471, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) (*"AADC"*), held that § 1252(g) applies narrowly to the Attorney General's decision to "commence proceedings, adjudicate cases, or execute removal orders." If "[i]t is implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings," *id.* 525 U.S. 471, 119 S.Ct. at 943, it is even less plausible that the mention of these discrete events was a shorthand way of referring to all claims brought in immigration matters. Because this case does not involve any of the "specific steps in the deportation process," *id.* 525 U.S. 471, 119 S.Ct. at 944 n. 9, or any aspect of the deportation process at all, § 1252(g) does not apply. *See Russell v. INS*, 1999 WL 675255, at *2 (N.D.Ill. Aug. 24, 1999) ("This case challenges denial of a visa petition, and the INS is not trying to deport Plaintiff; thus, this case does not fall under the ambit of the IIRIRA.").

### B. Section 1252(a)(2)(B)

■ The remainder of defendants' jurisdictional arguments rest primarily on an issue the court has already decided in plaintiff's favor. In its March 15, 1999, order, the court held that plaintiffs request a ministerial, rather than a discretionary, decision. Defendants continue to contend, however, that the relief requested in the instant case implicates the Attorney General's discretion. Defendants argue that plaintiffs are complaining about the Attorney General's "decision" not to adjudicate an application for adjustment of status. Defendants suggest that this "decision" was made pursuant to 8 U.S.C. § 1255, which governs adjustments of status, and argue that therefore, 8 U.S.C.

---

1. The court notes as an initial matter that § 1329 does not provide jurisdiction in the instant case. Section 1329 grants district courts jurisdiction over "all causes ...

brought by the United States that arise under the provisions of this subchapter" but does not provide jurisdiction for suits against the United States or its agencies or officers.

§ 1252(a)(2)(B)(i) deprives this court of jurisdiction.

Section 1252(a)(2)(B) is entitled "Denials of discretionary relief." Subsection (i) of this section reads, "no court shall have jurisdiction to review ... any judgment regarding the granting of relief under ... § 1255." 8 U.S.C. § 1252(a)(2)(B)(i). Defendants contend that the broad language "any judgment" means that this court does not have jurisdiction to "review" the Attorney General's refusal to entertain plaintiffs' applications. This argument is flawed in several respects. Subsection (i) clearly falls under a section of the statute that discusses *denials* of relief. Were plaintiffs contending that they had been denied relief, this court likely would not have jurisdiction over their claims. *See, e.g., Diallo v. Reno,* 61 F.Supp.2d 1361, 1367 (N.D.Ga.1999) ("8 U.S.C. § 1252(a)(2)(B)(i) precludes judicial review of a § 1255 denial of adjustment of status"); *Cruz v. INS,* 871 F.Supp. 1049, 1052 (N.D.Ill.1995) (holding that the plaintiff was not entitled to judicial review of a denial of adjustment of status) (citing *Massignani v. INS,* 438 F.2d 1276 (7th Cir.1971)). Because plaintiffs have neither been denied nor granted relief, § 1252(a)(2)(B)(i) does not bar jurisdiction.

Moreover, even reading the language of § 1252(a)(2)(B)(i) broadly, plaintiffs are not asking this court to review any discretionary judgment regarding the granting of relief. Defendants attempt to analogize this situation to the "deferred-action" decisions the INS formerly made in deportation cases (discretionary decisions to withhold or terminate deportation). The evidence demonstrates that the INS did not decide to defer action on plaintiffs' applications. Nor do plaintiffs contend that defendants refused to entertain their applications. *See, e.g., Alvidres–Reyes v. Reno,* 180 F.3d 199 (5th Cir.1999) (holding that, in the deportation context, § 1252(g) deprived the court of jurisdiction to compel the Attorney General to entertain the plaintiffs' applications for suspension of deportation) (cited by defendants). Defendants admit that they began entertaining plaintiff's applications. Moreover, Teodor attests in his affidavit that defendants' agent went so far as to tell plaintiffs that their applications would have been approved on that date if Teodor's fingerprints had cleared, a statement defendants neither admit nor deny. From this point forward, however, defendants simply failed to do anything at all. This was not a "decision," let alone a discretionary call. Plaintiffs do not ask this court to "review" a governmental action, but to examine and rectify a gross inaction.

## C. Mandamus Jurisdiction

■ Because none of the cited provisions of the INA bar jurisdiction, the court must determine whether it has jurisdiction under the mandamus statute, 28 U.S.C. § 1361. This act grants district courts "jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." Mandamus jurisdiction can be invoked when: (1) the plaintiff has a clear right to the relief sought; (2) the defendant has a clear duty to perform; and (3) no other adequate remedy is available. *Blaney v. United States,* 34 F.3d 509, 513 (7th Cir.1994). The court will address each of these factors.

■ Under 8 U.S.C. § 1255, the Attorney General may adjust an alien's status to that of a lawful permanent resident if the alien applies for such an adjustment and is eligible for a visa, and if a visa is available to him at the time his application is filed. Defendants contend that plaintiffs do not have a clear right to have their applications adjudicated because all decisions related to the processing of an application for adjustment of status are discretionary. The court agrees with Judge Grady that § 1255 "provide[s] a right to an adjudication ... within a reasonable time." *Agbemaple v. INS,* 1998 WL 292441, at *2 (May 18, 1998).

Defendants also contend that the INS does not have a clear duty to issue a decision on an adjustment of status at all, let alone to issue such a decision before the end of the fiscal year. *See Diallo*, at 1367–68. As discussed above, the court rejects defendants' argument that all decisions related to the processing of an application for adjustment of status are discretionary. The court does not mean to suggest that defendants have a duty to adjudicate applications on a "first-come, first-served basis." *See, e.g., Rahman v. McElroy*, 884 F.Supp. 782, 786–87 (S.D.N.Y.1995). Defendants nevertheless had a non-discretionary duty to issue a decision on plaintiffs' applications within a reasonable time. *See Yu v. Brown*, 36 F.Supp.2d 922, 931 (D.N.M.1999) ("All other courts addressing this question have held that INS has a *non-discretionary* duty to process applications for LPR status as well as all other immigration applications.") (emphasis added) (citing cases); *id.* at 932 (holding that the INS "owe[s] Plaintiffs a non-discretionary duty to complete processing of Plaintiffs' [LPR] applications in a reasonable time."); *see also* 2 Am.Jur. Administrative Law § 379 ("Even though agency action may be subject to no explicit time limit, a court may compel an agency to act within a reasonable time."). *But see Diallo*, at 1368–69 ("The decision of how to handle and investigate [a plaintiff's] application for adjustment of status and the District Direcotr's denial of that application are clearly discretionary acts.").

Finally, defendants contend that plaintiffs have an adequate remedy: They can wait until the government institutes removal proceedings against them and raise their claims before the Immigration Judge. The court agrees that this may be the only remedy for an alien who is denied an adjustment of status. *See, e.g., Cruz*, 871 F.Supp. at 1052. But, as discussed above, the failure to adjudicate an application is different from the denial of an application. Defendant attempts to analogize the instant case to *Russell v. INS*, 1999 WL 675255 (N.D.Ill. Aug. 24, 1999), in which the plaintiff asked Judge Pallmeyer to issue an order of mandamus against an AAU who had allowed nineteen months to elapse without issuing a decision on Russell's case. Judge Pallmeyer held that the plaintiff had an adequate remedy: to wait until the judge issued his opinion. Following *Russell*, defendant argues that plaintiffs should simply wait until their applications are adjudicated. This suggestion is misguided. The character of the adjudication on Russell's application would not change no matter how long the AAU sat on the case. But the character of the adjudication on plaintiffs' applications changed forever on September 30, 1998 (in violation of this court's order), and this court alone can remedy plaintiffs' injury.

Judge Vasquez in the District of New Mexico found that the plaintiffs in *Yu v. Brown*, 36 F.Supp.2d 922 (D.N.M.1999), had established mandamus jurisdiction under nearly identical circumstances to those arise in the instant case. One of the plaintiffs in *Yu* had submitted her application for legal permanent residence two and a half years earlier. She later learned that her fingerprints had not cleared and refiled her fingerprint card. Judge Vasquez concluded that the defendants, including the INS, had a non-discretionary duty to process the plaintiffs' applications defendants, including the INS, had a non-discretionary duty to process the plaintiffs' applications and held that the defendants had breached this duty by failing to act on plaintiff Yu's application within a year of the time she refiled her fingerprint card. *See id.* at 933.

The court concludes that it has mandamus jurisdiction over the instant case. Plaintiffs have a right to have their applications for adjustment of status adjudicated, defendants have a duty to perform this adjudication within a reasonable time, and no other remedy is available to plaintiffs. The court therefore proceeds to a consideration of the merits.

The Department of Justice received plaintiffs' applications on November

5, 1997, over ten months before the end of the fiscal year. Teodor attests that at plaintiffs' February 23, 1998, visa interview, they were informed that their applications were complete but for their fingerprint card. Defendants do not present any evidence to counter plaintiffs' claim that by February 23, 1998, they would have been eligible for an adjustment of status as soon as Teodor's fingerprints cleared. Over the next seven months plaintiffs made repeated efforts to force defendants to perform the one ministerial act that would complete their applications. For seven months defendants were on notice that plaintiffs' fingerprints had not cleared and were in wilful derogation of their duty to process plaintiff's applications.

Defendants contend that they attempted to comply with the court's September 25, 1998, order before the end of the fiscal year. According to a memo written by defendants' counsel on September 24, 1998, defendants planned to send the September 25, 1999, order to the FBI and to ask the FBI to expedite Teodor's fingerprints. Jeffrey Gorski, a lawyer employed by the Department of State's Visa Office, attests that on September 30, 1998, the Assistant United States Attorney asked the Visa Office to issue a visa to the INS to allow plaintiffs' adjustment of incomplete, presumably because the FBI had not yet cleared Teodor's prints. The FBI's report shows that it did not receive Teodor's fingerprints until October 7, 1998. On October 8, 1998, Teodor's fingerprints cleared.

Plaintiffs were the victims of a bureaucratic nightmare. Although defendants have demonstrated that they made some efforts to comply with this court's September 25, 1999, order, the evidence demonstrates that none of the responsible parties coordinated their efforts to ensure that this court's order could be implemented. Plaintiffs should not be penalized for the government's misfeasance.

Plaintiffs' applications have been pending for over two years since they were first filed, for 19 months since Teodor refiled his fingerprint card, and for over a year since his fingerprints cleared. The court holds that defendants' failure to perform a non-discretionary duty within a reasonable time deprived plaintiffs of visas. Until September 30, 1998, plaintiffs had a right to have their applications adjudicated. Now that Teodor's fingerprints have cleared, plaintiffs are entitled to the visas they would have received but for defendants' failure to timely process their applications.

The court emphasizes that the instant case differs from cases in which immigrants who fail to timely apply for naturalization or citizenship and are later denied citizenship ask courts to use their equitable powers to reverse the denial. *See, e.g., INS v. Pangilinan,* 486 U.S. 875, 108 S.Ct. 2210, 100 L.Ed.2d 882 (1988). The aliens requesting naturalization in *Pangilinan* did not take affirmative steps to be naturalized before the expiration of the statute under which they were eligible for naturalization. See id. at 880, 108 S.Ct. 2210. The Ninth Circuit nevertheless reversed the district court decision and granted the aliens citizenship. It was in this context that the Supreme Court, reversing the Ninth Circuit, held: "[T]he power to make someone a citizen of the United States has not been conferred upon the federal courts, like mandamus or injunction as one of their generally applicable equitable powers." Id. at 883–84, 108 S.Ct. 2210. The court reasoned that once the statute expired, the aliens in Pangilinan no longer qualified for citizenship, and the Ninth Circuit was bound to adhere to this Congressional mandate. *See id.* at 883–84, 108 S.Ct. 2210. Plaintiffs in the instant· case, in contrast, both timely applied for an adjustment of status and demonstrated to the INS investigating officer's satisfaction that, with the exception of the ministerial fingerprint clearance, they qualified for the adjustment they requested. Defendants did not deny plaintiffs' applications; they simply declined to finish processing them. The writ of mandamus confers upon this

court the power to compel defendants to perform the duty they owe to plaintiffs.

Defendants argue that they do not have a legal duty to issue plaintiffs visas because the State Department has no legal authority to issue a visa under the FY 1998 Diversity Immigrant Visa Program.[2] Other courts have ordered the INS and the State Department to procure visa numbers after the end of a fiscal year. In *Marcetic v. INS*, 1998 WL 173129 (N.D.Ill. April 6, 1998), Judge Moran ordered the INS "to complete all remaining process of [a] plaintiff's adjustment of status." *Id.* at *2. Defendants attempt to distinguish *Marcetic*, arguing that because an Immigration Judge had already granted the plaintiff in that case legal permanent residence, Judge Moran's order did not implicate the Attorney General's discretion to adjudicate residence, Judge Moran's order did not implicate the Attorney General's discretion to adjudicate an adjustment of status application. This court has already found, however, that defendants owe plaintiffs a non-discretionary duty to complete the processing of their applications. Plaintiffs are in the same position as the plaintiff in *Marcetic:* Their applications would have been complete and they would have received visas but for defendants' error.

The court therefore follows *Marcetic* and orders defendants to process plaintiffs' applications and to grant plaintiffs all relief to which they would have been entitled had defendants processed their applications in a timely fashion. Accordingly, the court denies defendants' motion for summary judgment and grants plaintiffs' motion for summary judgment.

---

**2.** Defendants also argue that the State Department is not a party to the instant case. Throughout this case, defendants have tried to deftly transfer blame and responsibility from one governmental entity to another. The court will not allow defendants to play this shell game. The INS, the FBI, and the State Department are all arms of the United States of America, a defendant in the instant case.