Charles Kibaara NYAGA and Doin Kainyu Kibarra, Plaintiffs

v.

John ASHCROFT, as Attorney General of the United States; and Rosemary Langley Melville, as District Director, Atlanta Division of the Immigration and Naturalization Service, Defendants

No. CIV.1:01–CV–1249–ODE.

United States District Court, N.D. Georgia, Atlanta Division.

Feb. 20, 2002.

James V. Noonan, Noonan & Lieberman, Chicago, IL, Madeline S. Wirt, Whelchel & Dunlap, Gainesville, GA, Plaintiff's Attorney.

Julia B. Anderson, Office of the United States Attorney, Northern District of

Georgia, Atlanta, GA, Defendants' Attorney.

### ORDER

EVANS, District Judge.

This civil immigration case is presently before the court on Defendants' Motion to Dismiss or in the alternative for Summary Judgment and Plaintiffs' cross motion for summary judgment. Plaintiffs seek mandamus relief, pursuant to 28 U.S.C. § 1361, in the form of an order compelling Defendants immediately to "perform their legal duty to complete all remaining process of Plaintiff Charles Kibaara Nyaga's Adjustment of Status." [Pl. Compl. at 15]. For the reasons set forth below, Defendants' motion is DENIED and Plaintiffs' motion for summary judgment is GRANTED.

In the instant matter, Charles Nygaga, a citizen of Kenya, was selected to participate in the 1998 Diversity Visa Lottery Program, which permits aliens from under-represented areas of the world to apply for immigrant visas. 8 U.S.C. § 1153(c)(1)(A). As he already resided in the United States, he applied for an Adjustment of Status pursuant to the Diversity Program, through which he could attain legal permanent residency. 8 U.S.C. § 1154.

*Diversity Visa Lottery Program*

Section 203 of the Immigration and Naturalization Act ("INA"), 8 U.S.C. § 1153(c)(1)(A), constitutes the relevant statute governing the Diversity Visa Program. That statute requires the Attorney General to determine "for the most recent previous 5–fiscal–year period for which data are available," the total number of aliens by country of origin who were admitted to the United States or granted lawful permanent residency under the worldwide quota system in 8 U.S.C.

§ 1151(a) or as immediate relatives under 8 U.S.C. § 1151(b)(2). On the basis of these numbers, the Attorney General must divide 55,000 lottery visa openings among "low-admission regions." This provision was designed to enhance immigration from under-represented countries.

An alien from a "low-admission region" who otherwise meets the program's qualifications may apply once yearly to the Department of State to register for a diversity visa. Based upon the Attorney General's regional allocations for a given year, "[i]mmigrant visa numbers made available [under the diversity program] shall be issued to eligible qualified immigrants strictly in a random order established by the Secretary of State." 8 U.S.C. § 1153(e)(2). The program has been described as a "visa lottery" because of the random order of the State Department's assignment of visa eligibility. The relevant regulation refers to the application to be considered eligible to participate in the diversity visa "lottery" as a petition. 22 C.F.R. § 42.33(b).

Because the INS selects approximately 100,000 "winners" in each lottery, not every visa applicant actually receives a visa. Once an individual "wins" the lottery, and becomes eligible for consideration in the diversity visa program, the alien must then file an immigrant visa application.[1] *See* 22 C.F.R. § 42.33(h); Notices, Department of State Bureau of Consular Affairs; Registration for the Diversity Immigrant (DV–98) Visa Program, 61 Fed.Reg. 58730 (Nov. 18, 1996). This diversity visa application is the application upon which the decision whether or not to grant the immigrant visa is based, and lottery winners are encouraged to file quickly. *See* Notices, Department of State Bureau of Consular Affairs; Registration for the Diversity Immigrant (DV–98) Visa Program, 61 Fed.Reg. 58730 (Nov. 18, 1996). In reviewing the diversity visa application, the Government is required to conduct a back-

---

**1.** The regulations describe this as approval of the diversity visa petition. 22 C.F.R. § 42.33

ground check, including an FBI fingerprint check, a CIA name check and a records check.

Under the laws and regulations implementing the Diversity Immigrant Visa program, a person who: presently resides in the United States, is selected, and then submits a fee may receive an adjustment of status to permanent resident provided that (1) the applicant applies for adjustment, (2) the applicant is statutorily eligible for adjustment and (3) a visa number is available at the time that person's application is approved. *See* 8 U.S.C. § 1255(a). In addition, a spouse of a diversity lottery winner may also apply derivatively to adjust status, without impacting the number of diversity visas available to other lottery winners. 8 U.S.C. § 1153(d). A grant of adjustment of status is discretionary, even if an applicant satisfies the three requirements for eligibility. Because of the special benefit it confers upon an alien who would otherwise be required to depart the United States to apply for an immigrant visa, and then return, section 245 adjustment is considered to be "extraordinary relief." *Randall v. Meese*, 854 F.2d 472, 474 (D.C.Cir.1988).

The 1998 Diversity Visa program ran during fiscal year 1998, *i.e.*, October 1, 1997 to September 30, 1998. In the 1998 program, 55,000 diversity visas were available, of which approximately 51,000 were issued.

*Plaintiffs and the 1998 Diversity Visa Program*

Plaintiff Charles Nyaga ("Nyaga" or "Plaintiff Nyaga") is a citizen of Kenya who entered the United States in May 1996 as a student at Chattahoochee Technical College in Marietta Georgia. He graduated in June 1999. Plaintiff Doin Kibaara ("Kibaara" or "Plaintiff Kibaara"), Plaintiff Nyaga's wife, entered the United States on July 17, 1996 on a visitor visa.

On July 1, 1997, Plaintiff Nyaga was notified that he was one of 100,000 individuals selected to participate in the fiscal year 1998 diversity visa program, and was directed to submit an application for the visa and apply to adjust status. Nyaga submitted his status adjustment application in October, 1997, and provided all required documentation and information, including the processing fee, to the Immigration and Naturalization Service ("INS") by February 2, 1998, seven months before the end of fiscal year 1998. Contemporaneously, Kibaara submitted a derivative application to adjust status as Nyaga's wife.[2] Because Kibaara's entitlement to adjust status is derivative and based upon her husband's eligibility for a diversity visa, the focus in the instant case is on Plaintiff Nyaga's applications and eligibili-

---

**2.** There is some dispute between the parties as to whether Plaintiffs were eligible to file for adjustment of status. Defendants assert that Plaintiffs, who had entered the country legally, were at that time out of status because their respective visas had expired. Plaintiffs admit that they were technically out of status because Plaintiff Nyaga had worked while he was a student and his wife had not actually applied for derivative status as the wife of a lawfully admitted student.

Before January 14, 1998, INA § 245(i), 8 U.S.C. § 1255(I) ("section 245(i)") permitted out of status applicants to apply to adjust status upon payment of a $1,000 fee. This provision expired on January 14, 1998. Each Plaintiff submitted $1,000 above and beyond the filing fees to the INS, which they assert was to overcome the fact that they were out of status. Defendants maintain that the $1,000 fees were recorded as "other fees," not necessarily "out of status fees", but have not offered another explanation, and have kept the $2,000. Because Plaintiffs began the application process before January 14, 1998, the court concludes that section 245(i) applied to their applications so that they were eligible to apply to adjust status. *See Int'l. Immigrants Found., Inc. v. Reno*, 1999 WL 787900 (E.D.N.Y. Sept. 29, 1999).

ty for permanent resident status under the 1998 diversity visa program.

After the INS received all of Plaintiffs' application materials in February 1998, Plaintiffs received no further communications from the Government regarding the diversity visa or the adjustment of status. At no time did the Government schedule the interview required for adjustment of status, request additional information, or indicate that there was any problem with his application. Although Plaintiffs did not themselves inquire as to the status of their applications, the instructions from the INS included with the adjustment of status materials read: "While your application is pending before the interview, please DO NOT make inquiry as to the status of your case, since it will result in further delay." [*See* Pl. Exh. G]. This same correspondence states that adjustment of status applicants will be notified of their interview dates within twelve to eighteen months of receipt of the application. Thus, Plaintiffs would have been justified in not inquiring early into the status of their applications.

The INS sent Plaintiffs' fingerprint cards to the FBI for processing on February 20, 1998. There is no evidence, however, of any other action by the INS to process Plaintiff Nyaga's diversity visa application since that time, nor is there evidence that the INS even tried to follow up on the fingerprint check. Defendants admit that the INS took no further action on Plaintiffs' applications after sending the fingerprints to the FBI on February 20, 1998.

In February or March, 1998, Plaintiff Nyaga attended an interview at the INS for a temporary twelve-month work permit, at which time he asked the INS representative about the status of his diversity visa. Nyaga states that the INS representative indicated that there was nothing to do about the visa except wait. Plaintiff

Kibaara had a similar work permit interview in May or June of 1998, which Plaintiff Nyaga also attended. According to Plaintiffs they again asked about the diversity visa, and again were told there was nothing they could do but wait. Approximately three months before these work permits expired, each Plaintiff had a renewal interview with the INS, and again Plaintiffs contend that, when they inquired, the INS representatives told them there was nothing they could do about the diversity visas but wait. According to Plaintiffs, this same sequence of events occurred once again when their work permits were renewed for a second time. Defendants do not have records of such conversations taking place.

In the interim, Plaintiffs received no correspondence from the Government concerning the diversity visa application or applications to adjust status until Plaintiff Kibaara was notified to appear at the Atlanta INS office on January 23, 2001, for her adjustment of status interview, which both she and Plaintiff Nyaga attended. According to Plaintiffs, at that interview, the INS representative indicated that the diversity visa lottery information could not be located and that Kibaara's derivative application would have to be denied because Nyaga had no diversity visa. The Atlanta District Director of the INS sent a formal denial of Kibaara's application on February 28, 2001, explaining that since the diversity visa program for 1998 expired on September 30, 1998, an immigrant visa was no longer available, despite the fact the Government had failed to act on the application since February 20, 1998.

Plaintiff Nyaga's diversity visa application was not adjudicated or reviewed by the INS before the expiration of fiscal year 1998. The Government admits that the INS Atlanta District Office did not follow its own policy and procedure to give higher

priority to diversity visa related adjustment of status applications in the instant case. [*See* Def. Rsp. to Pl. Stmt. of Mat. Facts ¶ 46]. Defendants offer no explanation for this failure to act, aside from suggesting that the INS has more work than it can handle, which is not a very satisfying explanation given the high priority to be given to diversity applicants. The Government's failure to act to process Plaintiff Nyaga's diversity visa application is the sole reason the application was not adjudicated before the fiscal year ended.

Plaintiffs filed the instant suit on May 15, 2001, seeking an Order of Mandamus compelling Defendants to process and adjudicate Plaintiff Nyaga's diversity visa application and both Plaintiffs' adjustment of status applications as if fiscal year 1998 had not yet ended. They do not ask the court to issue the visas itself, as that is not within the court's authority. Defendants have filed a motion to dismiss the complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. In the alternative, Defendants ask the court to consider the motion as one for summary judgment. Plaintiffs oppose Defendants' motion to dismiss or for summary judgment and have filed a cross motion for summary judgment in response.

*Jurisdiction*

■ The court turns first to Defendants' argument that the court lacks jurisdiction over this matter. As a general rule, Congressional intent to limit the court's jurisdiction must be clear and convincing before a court will limit a petitioner's access to judicial review. *See e.g. Board of Governors of the Federal Reserve System v. MCorp. Financial Inc.*, 502 U.S. 32, 44, 112 S.Ct. 459, 116 L.Ed.2d 358 (1991); *Traynor v. Turnage*, 485 U.S. 535, 542, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988); *Horton Homes, Inc. v. United States*, 936 F.2d 548, 551 (11th Cir.1991). There is,

accordingly, a general presumption in favor of judicial review of administrative actions. *See INS v. St. Cyr*, 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001).

Defendants submit that the INA specifically precludes this court from exercising jurisdiction over this matter, under 8 U.S.C. § 1252. Section 1252, entitled "Judicial review of orders of removal" provides:

(a)(2)(B)  Denials of discretionary relief

Notwithstanding any other provision of law, no court shall have jurisdiction to review

(i) any judgment regarding the granting of relief under section … 1255 [adjustment of status] of this title, or

(ii) any other decision or action of the Attorney General the authority for which is specified under this subchapter to be in the discretion of the Attorney General, other than the granting of relief under [the asylum provisions].

8 U.S.C. § 1252(a)(2)(B). Consequently, Defendants assert that section 1252(a)(2)(B)(i) "precludes judicial review of any actions or decisions regarding an application for adjustment of status." [Def. Br. at 8].

■ Courts interpreting immigration statutes should resolve ambiguities in favor of the alien. *See INS v. Cardoza–Fonseca*, 480 U.S. 421, 449, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). In reviewing how other courts have applied section 1252, the court has found that two approaches have been taken, one of which reads section 1252 narrowly, and the other reading it more broadly. Under either interpretation, however, the undersigned concludes that section 1252 does not preclude this court from exercising jurisdiction in this particular instance.

■ Courts in New York, Texas, Minnesota and Oregon have narrowly interpret-

ed section 1252 as applying only to removal (formerly deportation) proceedings. *See Talwar v. INS,* 2001 WL 767018 (S.D.N.Y. July 9, 2001); *Fu v. Reno,* 2000 WL 1644490 (N.D.Tex. Nov.1, 2000); *Mart v. Beebe,* 94 F.Supp.2d 1120, 1123–23 (D.Or. 2000); *Shanti, Inc. v. Reno,* 36 F.Supp.2d 1151 (D.Minn.1999); *see also Burger v. McElroy,* No. 97–CV–8775, 1999 WL 203353 (S.D.N.Y. Apr.12, 1999) (explaining that Government agreed that section 1252(a)(2)(B)(i), which refers to the adjustment of status provisions, does not apply outside context of removal proceedings).

These courts have considered several factors when arriving at this conclusion. First, the title of section 1252 is "Judicial review of orders of removal," which implies that judicial review is limited only to the context of removal proceedings, and not adjudications of visa applications. *See e.g. Talwar,* 2001 WL 767018 at *3; *but see Wilhelm Pudenz, GmbH v. Littlefuse, Inc.,* 177 F.3d 1204 (11th Cir.1999) (noting that titles and section headings in legislation may be used to interpret ambiguous text, but not to limit the plain meaning.)

These courts have also looked at the act's legislative history to determine that Section 1252's limitation of jurisdiction applies only in removal proceedings. A review of the legislative history does support the conclusion that the provisions of section 1252 are limited to the removal process, as it refers only to removal proceedings and not to visa petitions or any other procedures outside the scope of removal proceedings. *See* H.R.Rep. No. 104–469 at 359, 473. Similarly, language establishing the effective date of section 1252(g) "provides that § 1252(g) shall apply 'without limitation to claims arising from all past,

pending, or future exclusion, deportation, or removal proceedings under such Act,' thereby implicitly limiting the scope of § 1252(g) to exclusion, deportation or removal proceedings." *Shanti,* 36 F.Supp.2d at 1158. In addition, Section 1252 replaced the section of the INA that formerly provided the exclusive procedures for judicial review of removal or deportation orders.

One final consideration is that if section 1252 is interpreted to preclude judicial review of matters other than removal proceedings, visa applicants and others impacted by arbitrary or abusive decisions by the INS would be unable to seek judicial review. Section 1252(b)(2) [3] explicitly provides only that the Circuit Court may review a removal order. This jurisdiction conferring language applies only to review of removal orders. Consequently, if section 1252 applies to more than just removal orders, it would divest the district court of jurisdiction to review even arbitrary INS determinations unrelated to removal proceedings, without substituting an alternative form of review. *See Mart,* 94 F.Supp.2d at 1124.

Taken together, these factors support a narrow interpretation of section 1252 as precluding district court jurisdiction only in the context of removal proceedings and not with respect to other procedures. Under this view, then, this court would clearly not be precluded from exercising jurisdiction over the case at bar as it is not a removal case. The problem with this narrower view of section 1252 in the context of the instant case is that, by its plain language, section 1252 applies specifically

---

**3.** Requirements for review of orders of removal

    (2) Venue and forms

      The petition for review shall be filed with the court of appeals for the judicial cir-

cuit in which the immigration judge completed the proceedings...

8    U.S.C. § 1252(b)(2).

to section 1255 adjustments of status, under which this claim arises.

Several courts, including other courts in this district, have interpreted section 1252 more broadly, concluding that the limitations on district court jurisdiction do apply to denials of adjustment of status under section 1255, because of the provision that "no court shall have jurisdiction to review any judgment regarding the granting of relief under section ... 1255." *See Iddir v. INS,* 166 F.Supp.2d 1250, 1254–56 (N.D.Ill.2001); *Paunescu v. INS,* 76 F.Supp.2d 896 (N.D.Ill.1999); *Diallo v. Reno,* 61 F.Supp.2d 1361 (N.D.Ga.1999); *Potapova v. Reno,* No. 99–CV–1310–MHS (N.D.Ga. Nov. 29, 1999) (unpublished opinion); *cf. Talwar,* 2001 WL 767018 at *4 (noting that section 1252 specifically mentions section 1255, so that the jurisdiction limitation may apply also to adjudication of an adjustment of status petition.) For the reasons explained below, the undersigned follows the other courts in this district and adopts the broader view that Section 1252 precludes a district court from reviewing actions or decisions regarding an application for adjustment of status.

In *Iddir,* for instance, the plaintiffs had applied for diversity visas, just like Plaintiffs in the instant matter. Due to a series of clerical delays, the *Iddir* plaintiffs were not interviewed for their visa applications until twenty months after the end of the fiscal year in which they had applied for visas. They filed suit shortly thereafter, and six months later (twenty-six months

after the close of the fiscal year of application) the INS "denied" the visas.[4] The court there held that, even though the INS "denied" the applications, the INS had not *adjudicated* their applications so that the court was not precluded by section 1252 from exercising jurisdiction over the case.[5] *See Iddir,* 166 F.Supp.2d at 1255.

Similarly, in *Paunescu,* the plaintiffs filed suit against the INS to compel the agency to adjudicate their diversity visa applications when such an adjudication had not been made by near the end of the fiscal year. There, as here, no significant action was taken by the INS to process the application in the last seven months before the fiscal year ended.[6] Consequently, the court determined that it had jurisdiction over the claim because the INS's failure to act was not a decision or a discretionary act, but rather a "gross inaction." *Paunescu,* 76 F.Supp.2d at 896.

In contrast, in *Diallo* and *Potapova* the INS had made final decisions to deny the adjustment of status applications before suit had been filed. *See Diallo,* 61 F.Supp.2d at 1365; *Potapova* at 1. Accordingly, section 1252 precluded the court from exercising jurisdiction to review those final decisions.

■ Defendants submit that section 1252(a)(2)(B) "precludes judicial review of any actions or decisions regarding an application for adjustment of status." In light of the broad view the undersigned is taking of section 1252, the court agrees

---

4. It is interesting to note that in *Iddir,* as here, the applicants were advised in correspondence from the INS not to inquire about the status of the application and told that interviews would not be scheduled until after the fiscal year had ended. *See Iddir,* 166 F.Supp.2d at 1255.

5. In *Iddir,* the court ultimately ruled in favor of the INS, finding that the claim was moot. *See Iddir,* 166 F.Supp.2d at 1260.

6. In *Paunescu* the applicant did receive an interview, whereas here, Plaintiff Nyaga received literally no communications from the INS after February 2, 1998, when he completed his application, regarding his diversity visa application.

that it is precluded from reviewing *actions or decisions* regarding an application for adjustment of status. The difficulty with Defendants' position that the court, therefore, lacks jurisdiction over the instant matter is that here, as in *Paunescu* and *Iddir*, no decision has been made regarding Plaintiff Nyaga's visa application, nor has any action been taken to process the application. In other words, Plaintiff is not seeking a review of a decision or action, which would be barred, but is seeking remediation of the lack of action, which is not barred. As a consequence, the court is not precluded from exercising jurisdiction.[7]

Defendants assert, however, that because the fiscal year in which Plaintiff Nyaga applied for the visa has expired, the court should treat the application as therefore automatically denied and not within its jurisdiction. Defendants cite *Kudina v. INS*, 2001 WL 1064789 (N.D.Ill. Sept.10, 2001), as support for this contention. *Kudina* is clearly distinguishable, as there the plaintiffs admitted that their applications were adjudicated and then denied, even though such processing was untimely. Here no such adjudication has taken place. The court's rightful concern is that individuals who, in good faith, apply for visas and follow the rules set forth by the State Department and local INS offices not be denied the opportunity for meaningful adjudication of those applications due solely to neglect by the INS. In this case, Plaintiff Nyaga followed the directions not to contact the INS about his application, and the INS did nothing with his application after sending his fingerprints to the FBI for analysis on February 20, 1998. While the court is sympathetic to the high work load of INS agents brought about by increasing demands without concomitant increases in resources, nevertheless, the Government failed to process Plaintiff Nyaga's application. Defendants have not offered any explanation for their inaction on Plaintiff Nyaga's application. The court will not reward such gross inaction by concluding that the application was automatically denied when the fiscal year expired.

■ Furthermore, this court does have mandamus jurisdiction over the instant case. 28 U.S.C. § 1361. Mandamus is proper if Plaintiffs can show a clear right to the relief sought; that Defendants have a clear, non-discretionary duty to act; and no other adequate remedy is available. *See Heckler v. Ringer*, 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984); *District Lodge No. 166, Intern. Ass'n of Machinists and Aerospace Workers, AFL–CIO v. TWA Services, Inc.*, 731 F.2d 711, 717 (11th Cir.1984); *Storey v. Rubin*, 976 F.Supp. 1478, 1482 (N.D.Ga.1997). Defendants submit that Plaintiffs do not meet any of these criteria.

■ The issue of Plaintiffs' right to relief is entangled in the question of Defendants' duty. If there is no duty to act, there can be no right to relief. Accordingly, the court first considers whether Defendants had a non-discretionary duty to act. Defendants aver that because the *decision* whether to issue a visa is not a non-discretionary act, they had no duty toward Plaintiff Nyaga. As explained above, however, the act in question is not the final decision whether the visa should have been granted, but rather, the act is processing the application, that is, gathering the information necessary to make the final decision. Therefore Plaintiffs assert that the Government has a plain, non-

---

7. To the extent that the inaction has been extended by this court's earlier order granting a preliminary injunction to Plaintiffs, the court finds the reasoning in *Iddir* persuasive, that a denial of the application made after Plaintiffs filed this action would not necessarily have been a true adjudication in this instance.

discretionary duty to adjudicate the application.

■■■ The law is quite clear that the court may not compel a discretionary action through mandamus. *See Heckler v. Ringer*, 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984); *Einhorn v. Dewitt*, 618 F.2d 347 (5th Cir.1980). The court may, however, compel the Government to exercise its discretion without actually interfering with that exercise. Congress could not have intended that the INS would not have to make diligent efforts to process as many applications and issue as many diversity visas as possible, so that Defendants do not have discretion whether or not to process the applications.[8] *See e.g.* 22 C.F.R. § 42.33(c) (providing that each fiscal year the number of applicants selected in the visa lottery "shall... be sufficient to ensure, to the extent possible, usage of all [diversity] immigrant visas...". Moreover, the statute authorizing diversity visas implies that the visa applications must be reviewed, and that the only discretion the Government has in reviewing the applications is to do so in a random order. *See* 8 U.S.C. § 1153(e)(2)[9]; *Rahman*, 884 F.Supp. at 787 ("Defendants have a clear duty to [process the applications by] interview[ing] the plaintiffs, but they do not have to schedule those interviews on any particular day or in any special sequence"); *see also Agbemaple v. INS*, 1998 WL 292441, *2 (N.D.Ill. May 18, 1998) ("by necessary implication the adjudication [of the non-diversity visa] must occur within a reasonable time. A contrary position would permit the INS to delay indefinitely. Congress could not have intended to authorize potentially interminable delays.") Thus, the Government has a non-discretionary duty to make diligent efforts in furtherance of adjudicating diversity visa applications.

Where, as here, the evidence shows that the Government failed to act to process Plaintiff Nyaga's application, the court may order Defendants to exercise their discretion by ordering them to adjudicate the application thoroughly and make a decision one way or another as if fiscal year 1998 had not yet ended. What this court may not do is mandate a certain outcome in that adjudication, as the final decision is the discretionary act.

Similarly, Defendants maintain that Plaintiffs cannot show a clear right to the relief sought because they "had no right or guarantee to the issuance of a diversity visa." [Def. Br. at 12]. Again, Defendants misstate the relief requested. Plaintiffs' Complaint clearly prays for the court to compel Defendants immediately to "perform their legal duty to complete all remaining process of Plaintiff Charles Kibaara Nyaga's Adjustment of Status." [Pl. Compl. at 15]. As explained above, and as stated in their briefs, Plaintiffs are not asking this court to issue the visa; rather, Plaintiffs are asking this court to order Defendants to review Nyaga's diversity visa application fairly and in a meaningful way. Defendants are correct that there was no guarantee that a visa would issue, but the court has concluded that the INS was obligated to take steps to process the application in a diligent manner. A determination to the contrary would render the diversity visa program meaningless. Therefore, Plaintiff Nyaga has a right for the visa application to be processed and a final, thorough decision made.

Finally, Defendants submit that mandamus is not Plaintiffs' only possible remedy. Section 1252(b)(9) provides for judicial re-

---

8. Were the government to have no duty to process the applications, no visas might ever issue, although once the visas are exhausted, clearly the duty has been fulfilled.

9. Diversity visas *"shall be issued* to eligible qualified immigrants strictly in a random order ..."* 8 U.S.C. § 1153(e)(2) (emphasis added).

view of final orders of removal. 8 U.S.C. 1252(b)(9). During removal proceedings, an alien whose adjustment of status application has been denied may reapply for an adjustment of status, which could then be judicially reviewed under section 1252(b)(9) as part of the appeal of the final removal order. *See* 8 C.F.R. 245.2(a)(5)(ii). Thus, the Government argues that, as an alternative to mandamus, Plaintiffs should wait for the Government to exercise its discretion to institute removal proceedings to adjudicate fully the diversity visa application. Aside from the fact that removal proceedings have not been initiated despite Defendants' assertion that Plaintiffs have been residing in this country unlawfully since 1997, the court agrees with Plaintiffs that "it is no remedy to a claim of government inaction for the plaintiff to have to continue to wait for action." [Pl. Br. in Resp. at 22, citing *Yu v. Brown*, 36 F.Supp.2d 922, 933 (D.N.M.1999)]. It is possible that the Government will never exercise its discretion to institute removal proceedings against Plaintiffs, leaving them in a kind of immigration limbo, without a remedy. Because requiring Plaintiffs to await removal proceedings does not provide an adequate remedy to the immediate injury of government inaction on the visa application, the court concludes that, for these Plaintiffs, there is no available alternative to mandamus.

Finally, Plaintiffs assert an alternative ground for this court to assert jurisdiction in the Administrative Procedure Act. Because mandamus jurisdiction is clearly proper in the instant matter, the court will not reach Plaintiff's alternative argument. Accordingly, Defendants' motion to dismiss for lack of subject matter jurisdiction is denied.

The court now turns to the merits of the case at bar and the parties' cross motions for summary judgment. Summary judg-

ment is proper when the record and the pleadings "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Because there are no genuine issues as to any material facts in this matter, the only question remaining is whether either party is entitled to judgment as a matter of law. This inquiry, in turn, rests upon determination of two issues: (1) whether Plaintiff Nyaga has a right to adjudication of the diversity visa application and (2) whether a meaningful remedy is available.

The court has already addressed the question of Plaintiff's right to have his application processed in determining whether mandamus is proper. Accordingly, the court turns to the hotly contested question of whether the Government has the legal authority to effectuate the relief requested.

Although the court has jurisdiction over this matter, and Plaintiffs have a clear right to have Nyaga's application processed, this case presents the difficult question of whether a remedy is available or whether the Government is without power to issue a visa since the fiscal year in which Plaintiffs applied for the diversity visa has ended. Recently, the Northern District of Illinois, in a case with similar facts, determined that, although the court had jurisdiction, the Government's impotence to issue the visa made the claim moot. *Iddir*, 166 F.Supp.2d at 1258–60. There, the court held that the plain language of section 1154 prohibited the government from issuing diversity visas after the expiration of the fiscal year. *Id.* at 1259. The court distinguished *Paunescu* and another case where the court had ordered the Government to issue visas after the fiscal year ended on the basis that, at the time of the order, the only act remaining for the Government was literally the ministerial act of issuing the visa, as a

substantive determination on the merits had already effectively, if not formally, been made.[10] *See Id.; Paunescu,* 76 F.Supp.2d at 903; *Marcetic v. INS,* 1998 WL 173129 (N.D.Ill. Apr.6, 1998). In *Iddir,* on the other hand, "plaintiffs were never granted any determination in their favor by either the INS or any court before [the fiscal year expired]; they would not have necessarily received visas had the INS adjudicated their applications." *Iddir,* 166 F.Supp.2d at 1259. *Iddir* is factually distinguishable from the case at bar on one very important basis: in *Iddir,* there was evidence that the INS had acted to process the plaintiffs' applications, although the process was not completed in time.[11] Here, no actions were taken since February 20, 1998, when the INS sent Nyaga's fingerprints to the FBI for analysis. Since then, there was no attempt to schedule an interview, and no attempt to conduct the rest of the background check or otherwise complete the adjudication of Nyaga's application.

Moreover, the court respectfully disagrees with the *Iddir* court's conclusion that the statutory language *plainly* prohibits the Government from processing Plaintiff Nyaga's application. The relevant statute provides: "Aliens who qualify, through random selection, for a visa under section 1153(c) of this title shall remain eligible to receive such visa only through the end of the specific fiscal year for which they were selected." 8 U.S.C. 1154(a)(1)(G)(ii)(II). This language concerns the eligibility of the alien to receive the visa. Every year there are more eligible applicants than there are visas, as the INS regularly invites roughly twice as many applications as available visas. An alien who is eligible to receive a visa is clearly not guaranteed to receive one. Thus, where the statute says "eligible to receive such visa" it cannot be referring to aliens who will receive visas. Rather, it is referring to those aliens who are eligible to be considered for visas, that is, aliens who have "won" the diversity lottery and are eligible to apply for a diversity visa.

The parties do not dispute that Plaintiff Nyaga was eligible to be considered for a diversity visa when he applied in 1997. The parties do not dispute that the INS took no action on Nyaga's application after February 20, 1998, nearly seven months before the expiration of fiscal year 1998. There is no dispute that the sole reason why Nyaga's application was not timely considered is the Government's failure to act or follow through on processing the application. This is not a case where Plaintiff delayed completing the application and the Government had incorrect information, as in *Diallo,* or failed to designate the diversity visa program as the reason for the application, as in *Potopova.* Nor is this a situation where a third party's act of terrorism prevented the Government from completing the process of adjudicating diversity visas.[12] Therefore, if

---

10. This was not an entirely accurate description of the facts in *Paunescu,* as in addition to the ministerial act of issuing the visa number, the FBI fingerprint check also had to be completed.

11. In *Iddir,* the interviews required for processing were scheduled, albeit out of time, indicating that at least a minimum of action was taken on the applications. Thus, although the INS never made a decision, at least there were efforts to complete the process. *Iddir,* 166 F.Supp.2d at 1253.

12. In 1998 terrorists bombed the United States embassies in Kenya and Tanzania, preventing some diversity visa applicants from being interviewed. In response, Congress passed Public Law 105–360, which allowed the INS to issue fiscal year 1999 visas to eligible 1998 applicants who were impacted by the explosions. Defendants cite to a declaration of Kevin C. Aiston, Deputy Chief of the legal advisory opinions division of the Visa Office, Bureau of Consular Affairs in the U.S. State Department, who explains that the INS

Nyaga is no longer eligible for the visa, it is *solely* because of the Government's gross failure to act. The Government maintains that, in essence, it is now impotent to act to remedy its own failure to act. Congress could not have intended for aliens to lose their eligibility to be considered for diversity visas due solely to government inaction. Moreover, no language in the statute prohibits the Government from issuing diversity visas out of time.[13] The statute does not provide that the INS is without power to issue such a visa, or that the visas somehow disappear at the stroke of midnight on the last day of the fiscal year.

Plaintiffs rightfully point out that the Government has presented no reason that the visa would not have been granted on the merits of Nyaga's application. Defendants have indicated that the failure to process the application was beyond their control due to the high case load of the INS. The court is not satisfied that the INS was incapable of processing an application that, by all accounts was in order and completed, and was to have been given high priority, within seven months.

The court regrets that it does not have jurisdiction to order the Government to issue a diversity visa immediately to Plaintiff Nyaga, and a derivative visa to Plaintiff Kibaara. The court is empowered to act only within its jurisdiction. Therefore, Defendants are ORDERED to adjudicate Plaintiff Nyaga's diversity visa application as if fiscal year 1998 had not ended, keeping in mind that roughly 3,500 visas were not issued and the fact that there is presently no evidence before the court that a visa would not have been granted on the merits had it been timely adjudicated. Accordingly, Defendants' motion to dismiss or for summary judgment in the alternative [8] is DENIED and Plaintiffs' cross motion for summary judgment [17] is GRANTED, consistent with this order. The court recognizes that granting relief in this instance may appear exceptional. The facts before the court are equally exceptional, and the court therefore specifically limits this case to its facts.

The court hereby orders Defendants to conduct a thorough review of Charles Nyaga's diversity visa application and applica-

---

finds support for its conclusion that the INA precludes the issuance of any diversity visas after the expiration of the fiscal year from this Congressional action.

Defendants also compare the case at bar to the situation that arose under the 1995 diversity visa program in which a calculation error by the State Department resulted in many more individuals of Polish origin "winning" the diversity lottery than could be awarded visas under the per-country calculation for visa numbers. Because each applicant had such a small chance of actually receiving a visa, Congress decided to permit the INS to issue visas to 1995 lottery winners from the 1997 diversity visas, without increasing the total number of visas available in 1997. [*See* Aiston Decl. at ¶ 9; Pub.L. 104–208 § 637].

In both of these situations, however, there was no evidence that the Government did not act diligently to process the applications as they were pending. Rather, these acts of

Congress served as an accommodation to the Government and the applicants when even diligence in processing the applications would not have led to a satisfactory result.

**13.** The regulations come close to providing explicitly that the Government does not have the power to issue visas after the end of the fiscal year. 22 C.F.R. § 42.33 provides in part, "The eligibility for a [diversity] visa ... ceases at the end of the fiscal year in question. Under no circumstances may a consular officer issue a visa or other documentation to an alien after the end of the fiscal year during which an alien possesses diversity visa eligibility." Read carefully, however, the central inquiry in the relevant regulation is whether the alien is still eligible for the visa. As explained above, Plaintiff Nyaga effectively retains his eligibility because the Government did not diligently act to process the visa. The regulation, therefore, does not change the court's analysis.

tion to adjust status on the merits as if fiscal year 1998 had not yet expired.