[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 5, 2003
THOMAS K. KAHN
CLERK

_____

No. 02-12265
_____

D. C. Docket No. 01-01249 CV-ODE-1

CHARLES KIBAARA NYAGA,
DOIN KAINYU KIBAARA,

Plaintiffs-Appellees,

versus

JOHN ASHCROFT,
as Attorney General of the United States,
ROSEMARY MELVILLE,
District Director, Atlanta Division of the
Immigration and Naturalization Service,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(March 5, 2003)**

Before EDMONDSON, Chief Judge, BARKETT and COX, Circuit Judges.

PER CURIAM:

The Defendants – John Ashcroft, Attorney General of the United States, and Rosemary Langley Melville, District Director of the Atlanta Division of the Immigration and Naturalization Service (INS) – appeal from the district court's order granting mandamus relief to the Plaintiffs, Charles Kibaara Nyaga (Nyaga) and his wife, Doin Kainyu Kibarra (Kibarra).[1] Nyaga, a resident alien, qualified for a diversity immigrant visa through the Fiscal Year 1998 Diversity Visa Program's random selection process. He submitted an application to adjust his status pursuant to 8 U.S.C. § 1255(a), but the INS did not adjudicate his application before fiscal year 1998 ended. In 2001, the Plaintiffs sought an order to compel the Defendants to adjudicate Nyaga's adjustment application. Invoking its mandamus jurisdiction, the district court concluded that the INS has a clear, non-discretionary duty to process Nyaga's application and ordered the Defendants to process Nyaga's application as though fiscal year 1998 had not ended. We conclude that even if the INS has a non-discretionary duty to process Nyaga's adjustment application, Nyaga's case was moot because as of midnight on September 30, 1998, he was no longer eligible to receive a diversity immigrant visa. We vacate the district court's order and remand with instructions to dismiss as moot.

---

[1] The parties apparently agree that Nyaga's wife's name is "Kibarra" notwithstanding the fact that her name was spelled "Kibaara" in the complaint.

## I. BACKGROUND

### A. The Diversity Visa Program

Through the diversity visa program, a limited number of immigrant visas are made available to individuals from countries that historically have had low rates of immigration to the United States. 8 U.S.C. § 1153(c) (2002). Under the program, the Attorney General identifies "low-admission states" and allocates diversity visas (immigrant visas made available through the diversity visa program) to natives of these states according to a formula established by statute. 8 U.S.C. § 1153(c)(1). A diversity visa enables the recipient to move to the United States as a lawful permanent resident (or, alternatively, to remain in the United States as a lawful permanent resident if the recipient is already lawfully within the United States and if the Attorney General adjusts the recipient's status) under the Immigration and Nationality Act. To be eligible for a diversity visa, an alien must have a high school education or have, within five years of the date of application for the visa, at least two years of work experience in an occupation that requires at least two years of training or experience. 8 U.S.C. § 1153(c)(2). If an alien is entitled to receive a visa under the diversity visa program, the alien's spouse and minor children are entitled to the same status. 8 U.S.C. § 1153(d).

The United States Department of State administers the diversity visa program. Eligible applicants must file a petition to be considered for a diversity visa, and after the filing period has ended, a computer randomly orders the petitions. 22 C.F.R. § 42.33(c) (2003). The State Department then selects, in rank order, a quantity of petitions estimated to be sufficient to ensure, to the extent possible, that all diversity visas authorized for issuance are issued. *Id.* These selected applicants – commonly referred to as diversity visa program "lottery winners" – are notified of their selection and receive instructions on how to apply for a diversity visa. *See* Notice of Registration Period and Requirements for the Fourth Year of the Diversity Immigrant Visa Program, 61 Fed. Reg. 58730, 58731 (November 18, 1996).

Selection as a "lottery winner" does not ensure that an applicant will receive a diversity visa. The total number of lottery winners exceeds the number of diversity visas available under the diversity visa program. *See id.* ("Being selected as a winner . . . does not automatically guarantee being issued a visa even if the applicant is qualified, because the number of entries selected and registered is greater than the number of immigrant visas available. Those selected will, therefore, need to complete and file their immigrant visa applications quickly."). The process to obtain a visa is lengthy: the applicant must submit numerous documents to the National Visa Office (including a passport, a birth certificate, police certificates, court records,

4

prison records, military records, and evidence of either education or work experience) and attend a visa interview. 8 U.S.C. § 1202.

Diversity visa lottery winners who reside abroad must travel to a United States embassy to complete the visa eligibility process. If a lottery winner is lawfully present in the United States, however, the alien may remain in the United States and apply to the INS to adjust his status to that of a lawful permanent resident. 8 U.S.C. § 1255(a). This adjustment procedure enables a lottery winner lawfully residing in the United States, such as an alien with a student visa, to receive an immigrant visa without returning to his native country. The Attorney General, at his discretion, may adjust an applicant's status to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for adjustment of status, (2) the alien is eligible to receive an immigrant visa and is admissible for permanent residence, and (3) a visa is immediately available to the alien at the time the application is filed. 8 U.S.C. § 1255(a).

According to statute, "[a]liens who qualify, through random selection, for a visa under [the diversity visa program] shall remain eligible to receive such visa only through the end of the specific fiscal year for which they were selected." 8 U.S.C. § 1154(a)(1)(I)(ii)(II). The State Department has promulgated regulatory provisions that automatically revoke diversity visa petitions and prevent the issuance of visas

and the allotment of visa numbers after midnight of the final day of the relevant fiscal year. *See* 22 C.F.R. § 42.33(a)(1) ("The eligibility for a visa . . . ceases at the end of the fiscal year in question. Under no circumstances may a consular officer issue a visa or other documentation to an alien after the end of the fiscal year during which an alien possesses diversity visa eligibility."); 22 C.F.R. § 42.33(e) ("A petition . . . shall be valid until Midnight of the last day of the fiscal year for which the petition was submitted. At that time, the petition is automatically revoked . . . and no diversity visa numbers can be allotted after that date."); 22 C.F.R. § 42.33(g) (Diversity immigrant visa numbers "shall be allotted only during the fiscal year for which a petition to accord diversity immigrant status was submitted and approved. Under no circumstances shall immigrant visa numbers be allotted after Midnight of the last day of the fiscal year for which the petition was submitted and approved.").

B.      Nyaga's and Kibarra's Applications for Adjustment of Status

Nyaga, a native of Kenya, entered the United States in May 1996 on a student visa. In July 1996, Kibarra, Nyaga's wife, entered the United States on a visitor visa. Nyaga filed a petition in February or March 1997 to enter the Fiscal Year 1998[2] Diversity Visa Program lottery. In a letter dated July 1, 1997, Nyaga was notified that

---

[2]     Fiscal year 1998 began on October 1, 1997, and ended at midnight on September 30, 1998.

he had been selected as a lottery winner. The letter informed him that 100,000 petitions had been selected for further processing, and that only 55,000 diversity visas were available under the Fiscal Year 1998 Diversity Visa Program. Nyaga was also informed, in a subsequent letter, that the INS would not accept applications to adjust status based on the Fiscal Year 1998 Diversity Visa Program until October 1, 1997, the first day of fiscal year 1998.

In October 1997, Nyaga submitted an application to adjust his status. Kibarra simultaneously submitted a derivative application to adjust her status based on her husband's eligibility to receive a diversity visa. Although Nyaga's and Kibarra's applications for adjustment of status were submitted in October 1997, their applications were not complete until the INS received their processing fees on February 2, 1998. After an applicant has submitted a complete application, other agencies assist with a background investigation that includes an FBI fingerprint check, a CIA name check, and a records check with the Bureau of Consular Affairs in the applicant's native country. On February 20, 1998, the INS forwarded Nyaga's and Kibarra's fingerprint cards to the FBI. The INS took no further action to process Nyaga's or Kibarra's adjustment applications before September 30, 1998, the final day of fiscal year 1998.

Under the Fiscal Year 1998 Diversity Visa Program, 97,319 applicants were designated as lottery winners eligible to receive a visa and 55,000 diversity visas were available. Only 51,565 diversity visas were actually issued under the program; almost 3,500 authorized diversity visas were not issued. Neither Nyaga's nor Kibarra's adjustment applications were processed before the end of fiscal year 1998, and neither Nyaga nor Kibarra received a visa.

From February 1998, when their applications were completed, until September 30, 1998, the end of the fiscal year, Nyaga and Kibarra did not formally inquire regarding the status of their applications because they were advised that they should not make such inquiries.[3] During fiscal year 1998, Nyaga attended at least two work authorization interviews, and he claims that he informally inquired about the status of his adjustment application during these interviews and was told that there was nothing he could do but wait. The INS does not have any record of these conversations.

---

[3] When Nyaga received the adjustment of status application forms, he also received a cover letter that instructed: "While your application is pending before the interview, please DO NOT make inquiry as to the status of your case, since it will result in further delay." (R.1-1 Ex. G at 1.) Morever, the Plaintiffs allege that the Atlanta District Office of the INS instituted a policy that prevented direct contact with the INS and that a prominent sign in the Atlanta District Office directs anyone with an inquiry to leave the INS building because person-to-person inquiries were not permitted.

On January 23, 2001, almost three years after their applications were completed, the INS interviewed Kibarra regarding her adjustment application. The INS denied Kibarra's application on February 28, 2001, on the grounds that Kibarra's derivative application was based on Nyaga's eligibility for a diversity visa and Nyaga was no longer eligible to receive a visa because fiscal year 1998 had ended. The INS did not issue a final decision on Nyaga's application before the Plaintiffs filed the complaint in this case.

## II. PROCEDURAL HISTORY

On May 15, 2001, Nyaga and Kibarra filed a complaint in the district court against Ashcroft and Melville, seeking to compel the Defendants to process Nyaga's application for adjustment of status under the Fiscal Year 1998 Diversity Visa Program and to grant Nyaga and Kibarra legal permanent resident status. The Plaintiffs assert jurisdiction under 28 U.S.C. § 1361 (mandamus jurisdiction), 28 U.S.C. § 1331 (federal question jurisdiction), 8 U.S.C. § 1329 (the Immigration and Nationality Act), and 5 U.S.C. § 704 (the Administrative Procedure Act). They allege that: (1) Melville is obligated to issue documents and take all necessary action to process Nyaga's application under the Fiscal Year 1998 Diversity Visa Program; (2) Melville lacks the authority to deprive the Plaintiffs of legal permanent resident status after the Plaintiffs submitted all necessary information and fees no later than February

9

2, 1998; and (3) the processing of Nyaga's application for adjustment of status is a purely ministerial, non-discretionary act which Melville was obligated to complete in a timely manner. Nyaga and Kibarra asked the district court to compel the Defendants to process Nyaga's application to adjust status[4] and declare that there are no just grounds to suspend the issuance of permanent residency documents to Nyaga and Kibarra.

The Defendants filed a motion to dismiss the complaint for lack of subject matter jurisdiction and for failure to state a claim and asked the district court, in the alternative, to consider the motion as a motion for summary judgment. The Plaintiffs opposed the Defendants' motion and filed a cross-motion for summary judgment. The district court denied the Defendants' motion and granted the Plaintiffs' motion.

The district court concluded that 8 U.S.C. § 1252 did not preclude the court from exercising jurisdiction, and further concluded that it could exercise mandamus jurisdiction under 28 U.S.C. § 1361. *Nyaga v. Ashcroft*, 186 F. Supp. 2d 1244, 1252-54 (N.D. Ga. 2002). Mandamus is proper if (1) the Plaintiffs can show a clear right

---

[4]    On the same day that the complaint was filed, the Plaintiffs also filed an emergency motion for a preliminary injunction. The motion sought, in part, to prohibit the INS from summarily denying Nyaga's adjustment application during the pendency of the litigation. The Defendants agreed that they would not take any action in connection with Nyaga's adjustment application until the district court issued a final ruling, and the court issued a consent order to that effect. Accordingly, the INS has not taken any action on Nyaga's application.

to the relief sought; (2) the Defendants have a clear, non-discretionary duty to act; and (3) no other remedy is available. *Heckler v. Ringer*, 466 U.S. 602, 617, 104 S. Ct. 2013, 2022 (1984). In reaching its conclusion, the court held that (1) Nyaga "has a right for the visa application to be processed and a final, thorough decision made"; (2) the INS "has a non-discretionary duty to make diligent efforts in furtherance of adjudicating diversity visa applications"; and (3) the Plaintiffs had no alternative remedy to mandamus. *Nyaga*, 186 F. Supp. 2d at 1253-54.

The court then examined the merits of the case and concluded that there were no genuine issues of material fact. *Id.* at 1254. Having already ruled that Nyaga had a right to adjudication of his application, the court devoted its attention to the "hotly contested" issue of whether the court could provide a meaningful remedy. *Id.* Although the Defendants contended that the INS and the Attorney General lack the authority to issue a visa to Nyaga or Kibarra because fiscal year 1998 has ended, the court concluded that 8 U.S.C. § 1154(a)(1)(I)(ii)(II) did not plainly prohibit the INS from processing Nyaga's application. *Id.* at 1255. Because the statute did not plainly prohibit the adjudication of Nyaga's application, the court turned to congressional intent and concluded that "Congress could not have intended for aliens to lose their eligibility to be considered for diversity visas due solely to government inaction." *Id.* at 1256. Although the court acknowledged that the State Department's regulations

11

"come close to providing explicitly that the Government does not have the power to issue visas after the end of the fiscal year," the court concluded that "the central inquiry" in the regulations is whether Nyaga "is still eligible for the visa," and that "Nyaga effectively retains his eligibility because the Government did not diligently act to process the visa." *Id.* at 1256 n.13.

In granting the Plaintiffs' motion for summary judgment, the court ordered the Defendants to adjudicate Nyaga's diversity visa application as if fiscal year 1998 had not ended. *Id.* at 1256-57 ("The court hereby orders Defendants to conduct a thorough review of Charles Nyaga's diversity visa application and application to adjust status on the merits as if fiscal year 1998 had not yet expired."). The court acknowledged that it lacked the jurisdiction to order the Defendants to issue diversity visas to the Plaintiffs; it could order the INS to adjudicate Nyaga's application but it could not mandate a certain outcome in that adjudication. *Id.* at 1253, 1256. The Defendants appeal.

## III. ISSUES ON APPEAL

We are presented with three issues on appeal: (1) whether the Plaintiffs' claim is moot; (2) whether the district court had subject matter jurisdiction to consider Plaintiffs' claim; and (3) whether the district court properly concluded that there were no genuine issues of material fact and that the Plaintiffs were entitled to judgment as

a matter of law. Because we conclude that the Plaintiffs' claim is moot, however, we do not address any other issues.

## IV. STANDARD OF REVIEW

We review questions of mootness under a plenary standard of review. *Ala. Disabilities Advocacy Program v. J.S. Tarwater Developmental Ctr.*, 97 F.3d 492, 496 (11th Cir. 1996).

## V. CONTENTIONS OF THE PARTIES

The Defendants contend that the district court erred when it concluded that the court was capable of providing meaningful relief to the Plaintiffs.[5] The Defendants argue that the plain language of 8 U.S.C. § 1154(a)(1)(I)(ii)(II), when read in conjunction with 8 U.S.C. § 1255(a), compels the conclusion that Nyaga is no longer eligible to receive a diversity visa because fiscal year 1998 has ended, and thus he cannot satisfy the statutory requirements for adjustment of status under § 1255(a). The Defendants further contend that congressional intent, reflected in Congress's prior efforts in passing ameliorative legislation related to the diversity visa program, evinces the clear understanding that Nyaga is no longer eligible to receive a diversity visa. Moreover, the Defendants argue that even if the statute is ambiguous, the State

---

[5] Because we decide this case on mootness grounds, we limit our discussion to the parties' contentions related to this issue.

13

Department has issued reasonable regulations that interpret the statute in a manner that renders Nyaga no longer eligible to receive a visa and this interpretation is entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S. Ct. 2778 (1984). On these grounds, the Defendants contend that the court is unable to accord meaningful relief to the Plaintiffs because, even if Nyaga's application to adjust status is processed, the Attorney General lacks the authority under § 1255(a) to adjust Nyaga's status because Nyaga is no longer eligible to receive a visa.

The Plaintiffs argue that if the INS processes Nyaga's application and concludes that Nyaga meets the education and background check requirements, Nyaga would be eligible to receive a visa. The Plaintiffs contend that the plain meaning of § 1154(a)(1)(I)(ii)(II), when interpreted in the context of the entire diversity visa program statute, *does not* establish that a lottery winner is no longer eligible to receive a visa after the relevant fiscal year ends; in Plaintiffs' view, the statute establishes that a lottery winner must *submit a complete application* by the end of the fiscal year. The Plaintiffs also contend that congressional intent supports their interpretation, arguing that Congress intended that the INS process all applications and that Congress could not have intended for a lottery winner to become ineligible for a visa due solely to the INS's inaction. The Plaintiffs argue that the State

14

Department's interpretation of § 1154(a)(1)(I)(ii)(II) is unreasonable and not entitled to *Chevron* deference because it is inconsistent with specific provisions of the diversity visa statute. Lastly, the Plaintiffs contend that, in prior years, the INS has instructed applicants to appear to obtain a visa even after the applicable fiscal year has ended. Accordingly, the Plaintiffs argue that Nyaga remains eligible to receive a diversity visa, and as a consequence, the case is not moot because this court is capable of providing meaningful relief.

## VI. DISCUSSION

Article III of the Constitution limits the jurisdiction of federal courts to the consideration of "Cases" or "Controversies." U.S. Const. art. III, § 2. The "case or controversy" requirement imposes justiciability limitations on federal courts, and these limitations include mootness. *See Soliman v. United States ex. rel. INS*, 296 F.3d 1237, 1242 (11th Cir. 2002). The doctrine of mootness is derived from Article III's "case or controversy" requirement because "an action that is moot cannot be characterized as an active case or controversy." *Adler v. Duval County Sch. Bd.*, 112 F.3d 1475, 1477 (11th Cir. 1997). The question of mootness is a threshold inquiry in every case; as the Supreme Court has noted, "the question of mootness is . . . one which a federal court must resolve before it assumes jurisdiction." *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S. Ct. 402, 404 (1971). If the district court is presented

with a moot case, the case must be dismissed because any decision on the merits would constitute an impermissible advisory opinion. *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir. 2001); *Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1217 (11th Cir. 2000).

A district court lacks the power, on mootness grounds, to decide a case if its decision cannot affect the rights of the litigants in the case. *Rice*, 404 U.S. at 246, 92 S. Ct. at 404; *see also Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 1951 (1969) ("[A] case is moot when . . . the parties lack a legally cognizable interest in the outcome."). This court has concluded that a case must be dismissed as moot if the court can no longer provide "meaningful relief." *Fla. Ass'n of Rehab. Facilities*, 225 F.3d at 1216-17. Before we can address the merits of this case, we must determine whether the district court could give meaningful relief to Nyaga and Kibarra.

The Plaintiffs requested two types of relief: (1) to "[c]ompel Defendants and those acting under them to immediately perform their legal duty to complete all remaining process of Plaintiff, Charles Kibaara Nyaga's, Adjustment of Status" and (2) to "[d]eclare that there are no just grounds to suspend issuance of all appropriate permanent residency documents to both Plaintiffs."[6] (R.1-1 at 15.) We view the first

---

[6] We acknowledge that, with respect to Kibarra, this request presents (1) a potential jurisdictional problem under 8 U.S.C. § 1252(a)(2)(B)(i) because Kibarra's derivative adjustment application was denied in 2001 and (2) a

request for relief (that the INS process Nyaga's application) as merely a means to the second request for relief (that the Attorney General adjust Nyaga's status and Kibarra's status to that of lawful permanent residents). If Nyaga is no longer eligible to receive a diversity visa, we conclude that an order requiring the INS to process his application on the merits – only to have their adjustment applications denied by the Attorney General because Nyaga does not meet the "eligible to receive an immigrant visa" requirement of § 1255(a) – would not constitute meaningful relief. Accordingly, the question of whether the district court could provide meaningful relief to the Plaintiffs reduces to a single inquiry: would Nyaga be "eligible to receive an immigrant visa" if the INS were to process his application on the merits and conclude that he would otherwise be admissible for legal permanent residence?

To answer this question, we must interpret the diversity visa statute, and our analysis begins with the language of the statute. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438, 119 S. Ct. 755, 760 (1999). "[U]nless there is some ambiguity in the language of a statute, a court's analysis must end with the statute's plain language." *Coggin Automotive Corp. v. Comm'r of Internal Revenue*, 292 F.3d 1326,

---

pragmatic concern because she does not have a pending application that could be granted under § 1255(a). Nonetheless, we do not address these issues because we conclude that Nyaga is not eligible to receive a visa. Because he is not eligible to receive a visa, it necessarily follows that Kibarra is not eligible to receive a visa as his spouse.

1332 (11th Cir. 2002).  When we examine the meaning of statutory words or phrases, however, we cannot examine statutory provisions in isolation.  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132, 120 S. Ct. 1291, 1300-01 (2000).  "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."  *Davis v. Mich. Dep't of Treas.*, 489 U.S. 803, 809, 109 S. Ct. 1500, 1504 (1989).

Nyaga and Kibarra have asked the Attorney General to adjust their status to that of a lawful permanent resident pursuant to 8 U.S.C. § 1255(a).  Section 1255(a) states:

> The status of an alien who was inspected and admitted or paroled into the United States may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is *eligible to receive an immigrant visa* and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.

8 U.S.C. § 1255(a) (emphasis added).  According to § 1255(a), the Attorney General may adjust Nyaga's status only if Nyaga is "eligible to receive an immigrant visa." But 8 U.S.C. § 1154(a)(1)(I)(ii)(II), a provision that relates to the procedures for filing petitions pursuant to the diversity visa program, states in full:

> Aliens who qualify, through random selection, for a visa under section 1153(c) of this title [the diversity visa program] *shall remain eligible to*

*receive such visa* only through the end of the specific fiscal year for which they were selected.

8 U.S.C. § 1154(a)(1)(I)(ii)(II) (emphasis added). If this section, when properly interpreted, means that Nyaga is no longer eligible to receive an immigrant visa because fiscal year 1998 has ended, then the Attorney General lacks the power to adjust Nyaga's status under § 1255(a). Therefore, the resolution of the mootness issue hinges upon this court's interpretation of the phrase "shall remain eligible to receive such visa" in § 1154(a)(1)(I)(ii)(II).

We agree with the Defendants that the phrase "shall remain eligible to receive such visa" plainly means that aliens, like Nyaga, who have been randomly selected to qualify for a visa under the diversity visa program cannot be issued a visa after midnight of the final day of the fiscal year for which they were selected. As of midnight on September 30, 1998, Nyaga was no longer eligible to receive an immigrant visa. The INS's failure to process Nyaga's application does not extend Nyaga's statutorily-limited period of eligibility for a diversity visa. "Eligible to receive such visa" is unambiguous, and because the phrase is unambiguous, our inquiry must end with the statute's plain language. In reaching this conclusion based on the statute's plain meaning, we are not alone. *See Iddir v. INS*, 301 F.3d 492, 500-01 (7th Cir. 2002) (concluding that even if the INS were to adjudicate applications

19

after the fiscal year ended, visas could not be issued); *id.* at 502 (Flaum, J., concurring) (concluding that the plaintiffs are no longer eligible to receive visas); *Fornalik v. Perryman*, 223 F.3d 523, 526 (7th Cir. 2000); *Vladagina v. Ashcroft*, unpublished at __ (S.D.N.Y. Apr. 8, 2002); *Iddir v. INS*, 166 F. Supp. 2d 1250, 1259 (N.D. Ill. 2001) (holding that "[t]he end of fiscal year 1998 was September 30, 1998, which means that plaintiffs are no longer eligible to receive visas"), *aff'd on other grounds*, 301 F.3d 492 (7th Cir. 2002); *Zapata v. INS*, 93 F. Supp. 2d 355, 358 (S.D.N.Y. 2000) ("The plain meaning of § 1154 is that after the fiscal year has ended on September 30, no diversity visas may be issued *nunc pro tunc* based on the results of the previous fiscal year's visa lottery."); *Diallo v. Reno*, 61 F. Supp. 2d 1361, 1368 (N.D. Ga. 1999).[7]

The Plaintiffs contend that when the phrase "shall remain eligible to receive such visa" is construed in light of its context, the phrase actually means "shall remain eligible *to apply for* such visa." The Plaintiffs rely on the fact that § 1154(a)(1)(I)(ii)(II) sets forth the procedure for applying for a diversity visa; the Plaintiffs contend that when this section is read as a whole, it is clear that a lottery

---

[7]  The Plaintiffs cite cases that, while arguably distinguishable from this case, could be read to support the proposition that the INS can issue visas after the fiscal year has ended. *Paunescu v. INS*, 76 F. Supp. 2d 896, 903 (N.D. Ill. 1999); *Marcetic v. INS*, unpublished at __ (N.D. Ill. Apr. 6, 1998).

20

winner "has until the end of the fiscal year to be eligible to apply for such visa." (Pls.' Br. at 29.) We disagree. Although § 1154(a)(1)(I) establishes the procedure for submitting a diversity visa petition, there is nothing in this section, when read in its entirety, that leads us to believe that the phrase "shall remain eligible to receive such visa" actually means "shall remain eligible to apply for such visa." Although the Plaintiffs argue that this section necessarily was intended to establish a deadline for submitting a visa application, we believe that it is just as likely that Congress intended to place an ultimate deadline on visa eligibility in order to bring closure to each fiscal year's diversity visa program. We conclude that even when the phrase "shall remain eligible to receive such visa" is read within the context of the entire procedural framework established in § 1154(a)(1)(I), the plain meaning of "shall remain eligible to receive such visa" does not change, nor is it rendered ambiguous.[8]

---

[8] The Plaintiffs also argue that our interpretation of § 1154(a)(1)(I)(ii)(II) undermines Congress's intent. The Plaintiffs present three arguments related to congressional intent: (1) Congress could not have intended for an alien to lose visa eligibility due solely to the INS's inaction; (2) Congress authorized the Secretary of State to establish a processing fee that will allow the State Department to recover the costs of processing *all* diversity visa applications; and (3) Congress's enactment of § 1153(c)(1)(E)(iv), which permits the redistribution of visa numbers among regions, reflects Congress's intent that all 55,000 available visas be issued.

While we rest our decision upon the plain meaning of § 1154(a)(1)(I)(ii)(II), it is not at all clear that our understanding of the plain meaning of the statute undermines Congress's intent. As we noted above, § 1154(a)(1)(I)(ii)(II) brings closure to each fiscal year's diversity visa program by declaring that lottery

Because we conclude that Nyaga is no longer eligible to receive a visa, the district court could not provide meaningful relief to the Plaintiffs and the court was compelled to dismiss this case as moot. In instructing the district court to dismiss on mootness grounds, we join several other courts that have addressed similar cases.

---

winners are no longer eligible to receive a visa after midnight on the last day of the fiscal year for which they were selected. Even if Congress intended for all applications to be processed and all authorized visas to be issued, and even if Congress did not intend for lottery winners to lose their eligibility due to the INS's inaction, it does not necessarily follow that Congress did not intend to establish an ultimate deadline for the issuance of visas under each fiscal year's diversity visa program.

Congress's prior legislative enactments related to the diversity visa program demonstrate that our understanding of the statute's plain meaning conforms to Congress's understanding of the statute. In 1996, Congress passed legislation which permitted Fiscal Year 1995 Diversity Visa Program applicants from Poland to receive diversity visas from the fiscal year 1997 visa numbers. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 637, Pub. L. 104-208, 110 Stat. 3009. In 1998, Congress enacted ameliorative legislation that authorized Fiscal Year 1998 Diversity Visa Program applicants from Kenya and Tanzania (whose visa interviews could not be conducted on time because the United States embassy in Kenya had been bombed) to receive visas from the fiscal year 1999 visa numbers. Act of November 10, 1998, § 1, Pub. L. 105-360, 112 Stat. 3276. While neither situation involved the INS's failure to process a lottery winner's application, this distinction is irrelevant; Congress's action clearly evinces its understanding that an applicant is no longer eligible to receive a visa, absent legislative action, after the relevant fiscal year has ended even if there are unissued visa numbers remaining from the relevant fiscal year.

Additionally, because we conclude that the statute's plain meaning is clear, we need not address the Defendants' argument that we must accord *Chevron* deference to State Department regulations that interpret § 1154(a)(1)(I)(ii)(II) in a manner that renders applicants no longer eligible to receive visas after the applicable fiscal year has ended.

22

*Vladagina*, unpublished at __ (S.D.N.Y. Apr. 8, 2002); *Iddir*, 166 F. Supp. 2d at 1260 (concluding that the case should be dismissed as moot because "[a]ny order by this court compelling the INS to adjudicate plaintiffs' applications would be a futile act"); *Zapata*, 93 F. Supp. 2d at 358 (concluding that the court could not provide effectual relief to the plaintiffs because fiscal year 1998 had ended and fiscal year 1998 visas could not be issued "to anyone"); *see also Iddir*, 301 F.3d at 502 (Flaum, J., concurring) (departing from the majority and stating that the case is moot because "it is the INS's lack of *power* to grant effectual relief – not its lack of *duty* – that makes the claims nonjusticiable").[9]

## VII.  CONCLUSION

The plain meaning of 8 U.S.C. § 1154(a)(1)(I)(ii)(II) establishes that Nyaga's eligibility for a diversity visa expired at midnight on September 30, 1998.  Therefore, Nyaga is not "eligible to receive an immigrant visa" and the Attorney General lacks the authority to adjust Nyaga's status to that of a lawful permanent resident under § 1255(a).  As a consequence, the district court could not provide meaningful relief to

---

[9]      Nyaga and Kibarra may once again submit petitions to enter the diversity visa program lottery with the hopes that one of them will be selected and that this time, unlike the last, the Defendants will process and adjudicate their applications before the fiscal year ends.  They may also petition Congress for a private bill of relief.  *See, e.g.*, H.R. 509, 108th Cong. (2003) ("For the relief of Lindita Idrizi Heath"); H.R. 392, 108th Cong. (2003) ("For the relief of Natasha Oligovna Russo and Anya Oligovna").

the Plaintiffs, and should have dismissed the action as moot. We vacate the district court's order and remand the action with instructions that the district court dismiss the action as moot.

VACATED AND REMANDED WITH INSTRUCTIONS TO DISMISS AS MOOT.

BARKETT, Circuit Judge, dissenting:

I would affirm the district court's grant of mandamus ordering the Immigration and Naturalization Service ("INS") to do that which was required of it by Congress: process Nyaga's application for a diversity immigrant visa. See Armstrong v. Martin Marietta Corp., 138 F.3d 1374, 1378 (11th Cir. 1998) (en banc) (recognizing that the writ of mandamus is an appropriate remedy to correct the failure to carry out a ministerial task) (citing In re Estelle, 516 F.2d 480, 483 (5th Cir. 1975)).[1] The INS takes the position that it is free to completely disregard a Congressional directive. This view is problematic in the abstract, to say the least, but in this case the INS' stance renders nugatory an entire section of the Immigration and Nationality Act ("INA"). See 8 U.S.C. § 1153(c).

Section 1153(c) of the INA is comprised of three subsections that, together, establish the diversity immigrant visa program. As the majority notes, the diversity visa program is designed to provide permanent residence visas to individuals from countries with historically low rates of immigration to the United States. In the first subsection of § 1153(c), entitled "In General," Congress details the bulk of the

---

[1] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

25

program.[2] See id.  In the introductory paragraph to § 1153(c)(1), Congress states that "[e]xcept as provided in paragraph (2), aliens subject to the worldwide level specified in section 1151(e) of this title for diversity immigrants shall be allotted visas each fiscal year as follows . . . ."  Id.  (emphasis added).

Although the Department of State generally administers the diversity visa program, the INS is responsible for adjudicating and issuing diversity visas to applicants who reside in the United States at the time of their selection.  Once an alien receives notice of his selection in the diversity visa program, he is eligible to apply for an adjustment to permanent resident status.[3]  See 8 U.S.C. § 1255.  To receive a status adjustment, the alien must meet three criteria: 1) the applicant must apply for the adjustment; 2) the applicant must be statutorily eligible for the adjustment; and 3) the INS must have a visa number available when the alien's application is approved.  See § 1255(a).  While the ultimate decision whether to adjust an alien's status is discretionary, diversity visa applicants who are selected to participate in the

---

[2] The other two subsections of § 1153 are short, and of little relevance to Nyaga's claims. Specifically, § 1153(c)(2) is an eligibility provision that dictates aliens must have at least a high school education and two years of work experience "in an occupation which requires at least two years of training" in order to receive a visa.  § 1153(c)(2).  Section 1153(c)(3) dictates that the Secretary of State maintain information on all immigrants issued visas.  See § 1153(c)(3).

[3]  An "adjustment of status" is a procedure for becoming an "alien lawfully admitted for permanent residence."  See 8 U.S.C. § 1255(a).  It allows resident aliens to remain in the United States during the application process rather than requiring them to leave the country in order to apply.

26

program (the "lottery winners") satisfy § 1255(a)'s criteria simply by applying for the adjustment and meeting § 1153(c)'s eligibility requirements. And, as the INS concedes in its brief, an otherwise eligible immigrant[4] who has complied with these requirements would ordinarily face no impediment to a status adjustment, save the possibility that all of the available visas under the diversity program had already been issued to other applicants.

Throughout § 1153(c)(1) Congress chose to employ authoritative language that affirmatively directs action. The term "shall" pervades § 1153(c). In addition to its use in the introductory phrase "diversity immigrants shall be allotted visas," § 1153(c)(1), Congress repeated the term eleven times in § 1153(c), stating that the INS, the Attorney General, or the Secretary of State "shall" perform certain functions. See § 1153(c)(1)(A) ("[t]he Attorney General shall determine"), (B)(i) ("[t]he Attorney General shall identify"), (B)(ii) ("[t]he Attorney General shall identify"), (C) ("[t]he Attorney General shall determine"), (D) ("[t]he Attorney General shall determine"), (E)(iv) ("excess visa numbers shall be made available") (emphases added).

---

[4] As part of the application process, the INS must also interview the applicant and conduct a complete background investigation, including an FBI fingerprint check, a CIA name check, and a records check through the Bureau of Consular Affairs in the applicant's native country. See 22 C.F.R. § 42.67; Iddir v. INS, 166 F. Supp. 2d 1250, 1253 (N.D. Ill. 2001).

Section 1153(c) also contains clear language directing the INS to distribute all available diversity immigrant visas for a given fiscal year. Most notably, § 1153(c)(1)(E)(iv) gives the Secretary of State the following command:

> If the Secretary of State estimates that the number of immigrant visas to be issued to natives in any region for a fiscal year under this paragraph is less than the number of immigrant visas made available to such natives under this paragraph for the fiscal year, subject to clause (v), the <u>excess visa numbers shall be made available</u> to natives (other than natives of a high-admission state) of the other regions in proportion to the percentages otherwise specified in clauses (ii) and (iii).

§ 1153(c)(1)(E)(iv) (emphasis added). By its plain language, § 1153(c)(1)(E)(iv) directs the Secretary of State (and the INS in the course of processing adjustment of status applications) to distribute all available diversity immigrant visas each year. <u>See id.</u> If the Secretary determines that the immigrant visas allocated to one region will not be fully distributed, then those visas must be made available to applicants from other regions. <u>See id.</u> Section 1153(c)(1)(E)(iv)'s clear mandate is that all of the diversity immigrant visas that Congress sets aside be distributed to eligible applicants (i.e. applicants who satisfy § 1153(c)(2)).

Each year the Department of State receives several million applications for the diversity immigrant visa program. In 1997, Nyaga was one of these applicants and on July 1, 1997, he received notification of his selection as one of the 100,000 lucky

28

"winners" chosen to participate in the program.[5] This notification letter made it clear that Nyaga was not automatically entitled to a visa, but did indicate that he was among the "100,000 DV-98 entries [that] were randomly selected" to apply for one of the 55,000 available visas. The letter also instructed Nyaga of the necessary forms that he must file with the National Visa Center[6] and cautioned him to "carefully follow these instructions to increase your chances of possible visa issuance." A subsequent letter dated September 26, 1997, informed Nyaga that "the 1998 Diversity Lottery Program requires a $75.00 diversity visa processing fee, per person."[7] This letter notified Nyaga that, as an applicant residing in the United States, he must also apply for an "adjustment of status" directly with the INS, which he did. The INS' "adjustment of status" application required Nyaga to complete several forms, attach numerous supporting documents "including pictures and [a] medical examination

---

[5] The common reference to aliens selected to apply for an immigrant visa under the diversity program as "lottery winners" is something of a misnomer: in reality the alien simply becomes eligible to apply for a permanent visa under the program. "Winning" aliens do not necessarily receive a visa. Typically, the INS selects around 100,000 "winners" for the 55,000 visas that are available each year. See 8 U.S.C. § 1151(e). The INS uses this system because it has found that only around one-half of the aliens selected to apply for diversity visas are both qualified to receive the visa and actually file an application. See Diallo v. Reno, 61 F. Supp. 2d 1361, 1363 n.3 (N.D. Ga. 1999).

[6] The National Visa Center was established and is directed by the Department of State.

[7] Nyaga paid an application fee of $300.00.

report," and pay a fee of "$130.00 for applicants 14 years of age or older and $100.00 for applicants under the age of 14."[8]

It is not disputed that Nyaga properly completed both the diversity visa application and the "adjustment of status" application on or before February 2, 1998. This left the INS just under eight full months to adjudicate his petition before the end of fiscal year 1998. However, other than forwarding his fingerprint cards to the FBI on February 20, 1998, the INS did not act upon Nyaga's petition prior to the end of the fiscal year.[9] Nyaga now quite reasonably argues that, at the very least, his timely completion of the diversity visa program's procedural and fiscal requirements should have entitled him to an equally timely adjudication of his application. According to the INS, this is not so.

Incredibly, the INS relies upon its own inaction during fiscal year 1998 as the justification for its current impotence to issue Nyaga a visa. Since under 8 U.S.C. § 1154(a)(1)(I)(ii)(II) eligibility for the diversity program is limited to the fiscal year in which the alien was selected to participate, the INS argues that its failure to act

---

[8] Nyaga's application included a payment to the INS of $1,200.00 which included a $130.00 filing fee for his adjustment of status application (I-485), a $1,000.00 "other fee," and a $70.00 fee for his employment authorization application (I-765).

[9] This failure by the INS to act was not due to the unavailability of diversity visas that year. When the fiscal year 1998 ended, more than 3,000 diversity visas were left undistributed.

upon Nyaga's application during the 1998 fiscal year renders him statutorily ineligible to receive a diversity visa.[10]  See § 1154(a)(1)(I)(ii)(II).  To be clear, the INS failed to adjudicate Nyaga's application during the fiscal year in which he applied and, based on this failure, now contends that Nyaga is no longer eligible for a 1998 diversity visa.  The majority reluctantly accepts this argument and, as a consequence, deems Nyaga's claim for relief moot under § 1154(a)(1)(I)(ii)(II).

I question the propriety of this judgment because, under the majority's reading of the statute, Nyaga faces an intractable conundrum.  Nyaga was rendered technically ineligible for relief under § 1154(a)(1)(I)(ii)(II), not due to any error of his own, but rather as the result of the INS' unilateral failure to comply with the directives of the INA.  Such a result is particularly offensive because it is clear from the statute that Congress expected the INS to perform the ministerial duties required by the program (i.e. to assure the distribution of the allotted visas) and, thus, under § 1153(c), Nyaga was entitled to have the INS adjudicate his timely-filed diversity visa application.[11]  See Iddir v. INS, 301 F.3d 492, 500 (7th Cir. 2002); Paunescu v.

---

[10]  The INS generously points out that though ineligible for a 1998 diversity visa, Nyaga can reapply to the program each year.  As Nyaga must literally "win the lottery" to regain his eligibility, this is hardly a constructive suggestion.

[11]  The INS all but concedes this point in its brief, stating that "Nyaga is arguably entitled to an adjudication of his diversity visa based adjustment application."  INS Br. p. 29.

INS, 76 F. Supp. 2d 896, 900 (N.D. Ill. 1999).

Because, in my view, § 1153(c) of the INA requires the INS to act on diversity visa applications, I believe the district court properly found that mandamus is the appropriate remedy to compel the INS to perform its ministerial role under the INA and adjudicate Nyaga's application.  See Armstrong, 138 F.3d at 1378.